**Lloyd STRONG, Appellant–Plaintiff,**

v.

**Steve A. JACKSON and Judy L. Jackson, Appellees–Defendants.**

**No. 76A03–0202–CV–54.**

Court of Appeals of Indiana.

Nov. 4, 2002.

Latriealle Wheat, Angola, IN, Attorney for Appellant.

John M. Haecker, Grimm & Grimm, Auburn, IN, Attorney for Appellees.

## OPINION

BARNES, Judge.

### Case Summary

Lloyd Strong appeals the trial court's judgment upholding the sale of his personal property to Steve Jackson and reforming the contract that transferred Strong's real property to Jackson rather than rescinding it. Jackson effectively cross-appeals the reformation of the real estate contract. We affirm in part, reverse in part, and remand.

### Issues

We restate the issues before us as:

I. whether the trial court erred in concluding that the real estate transaction was the result of constructive fraud;

II. whether the trial court erred in reforming the real estate contract to provide Strong with an equitable life estate in the property instead of rescinding the contract altogether after it concluded the contract was the result of constructive fraud; and

III. whether the trial court erred in concluding the sale of Strong's personal property to Jackson was not the result of constructive fraud.

## Facts

There are no fewer than three sides to many parts of this story, which we must attempt to harmonize.[1] Strong, who was born in 1919, has known Jackson, born in 1944, for a number of years. Jackson, who is an owner of several Fort Wayne businesses, frequently hunted on Strong's 102 acre Steuben County farm, where Strong has lived for many years, at Strong's invitation. In 1994, Strong brought a lawsuit against his son, Gary, in relation to farming operations they were supposed to be jointly undertaking in DeKalb County. That lawsuit ultimately resulted in a $33,996.41 judgment against Strong on counterclaims brought by Gary, which judgment this court affirmed on appeal in a memorandum decision. *Strong v. Strong,* No. 17A03–9602–CV–48, 678 N.E.2d 1299 (Ind. Ct.App. April 11, 1997). Strong frequently consulted Jackson on various matters, including his lawsuit and ongoing dealings with Gary. On August 1, 1997, Strong designated Jackson as his attorney-in-fact. Strong executed a second power of attorney document naming Jackson on May 26, 1998, just a few weeks after Strong had named his son Frank and his wife as his attorneys-in-fact.

Gary took little action to collect his judgment against Strong for nearly a year after we affirmed it, and Strong made no attempt to pay it. In the spring of 1998, however, a new attorney for Gary requested the issuance of a writ of execution against Strong's Steuben County property.

At a May 13, 1998 hearing in DeKalb County on that request and other matters, Strong testified under oath that he had no assets with which to pay the judgment. The DeKalb Circuit Court issued the writ following the hearing; thereafter, the Steuben County Sheriff notified Strong on May 27, 1998, that he would proceed with a sheriff's sale of Strong's property as requested in the writ if Strong did not pay the judgment by June 26, 1998. Gary's attorney scheduled depositions with Strong and Jackson for June 18, 1998, in relation to an apparently fraudulent mortgage Strong had granted on the Steuben County farm.

Attorney Allen Stout and Jackson explored with Strong various options for paying the judgment, none of which Strong agreed to follow. At this point, the parties' stories sharply diverge. The evidence most favorable to the judgment, however, reveals that on June 17, 1998, Strong telephoned Stout and said that he had agreed to transfer his Steuben County property and the personal property thereon to Jackson, in exchange for which Jackson would pay the judgment. Strong also indicated that Jackson had promised that Strong could live on the farm for the rest of his life. Stout telephoned Jackson and confirmed this plan, including that Strong would be allowed to live out his life on the farm, but Jackson told Stout he would not accept the real estate with a life estate to Strong attached to it. Stout apparently did not pass this information along to Strong.

On June 18, 1998, Strong drove approximately one hour from his home to Jackson's office in Fort Wayne. There, Strong was presented with the Warranty Deed and Bill of Sale Stout had prepared. Stout

---

1. The testimony of Strong and Jackson, of course, frequently conflict on many points, but the testimony of attorney Allen Stout, who was also involved in this transaction, also often conflicts with both Strong's and Jackson's version of events.

said something to the effect that after Strong signed these documents, Jackson would own everything, "down to the kitchen table," to which Strong replied "Good.... Gary can't get my property." Tr. pp. 393–94. Strong then signed the documents. As Strong left, Jackson reassured him that he could continue living on the farm as Jackson had promised. Later, at the trial in this matter, Strong testified that he thought he was signing some type of restraining order against Gary and that the light in Jackson's office was so poor he could not see what he was signing. Stout testified, however, that Strong did not appear to be having any trouble with his vision or competency when he signed the documents. Strong also attested in an affidavit produced earlier in this litigation that he knew he signed a deed transferring the real property to Jackson. Several witnesses testified that the office was well lit. A competency exam performed on Strong in December 1997 indicated he displayed no signs of dementia and had an I.Q. of 109. Later in the day of June 18, 1998, Jackson tendered a check to Gary's attorney in the amount of $41,268.85 to satisfy the outstanding judgment plus interest.

Strong continued to live on his Steuben County farm without interference until August 9, 1999, when Strong's new attorney wrote Jackson informing Jackson that his power of attorney was being revoked and requesting that he reconvey the property he obtained on June 18, 1998, to Strong. When Jackson refused, Strong sued Jackson and his wife (who had obtained joint title to the property) on August 18, 1999. Strong also moved for the issuance of a temporary restraining order and a preliminary injunction to prevent Jackson from disposing of certain items of personal property purportedly transferred to Jackson on June 18, 1998. Jackson's counsel agreed in open court on September 2, 1999, not to dispose of the personal property and to permit Strong to continue to reside on the property during the pendency of the case; the restraining order and motion for an injunction were then dismissed.

The trial court conducted a hearing on this matter in July and August of 2001 and entered findings of fact and conclusions thereon on January 11, 2002. It concluded that Jackson had committed constructive fraud by accepting transfer of the real estate without securing a life estate in the property for Strong. The trial court, therefore, reformed the real estate contract by granting Strong an equitable life estate in the farm, with entitlement to the balance of the CRP payments[2] for the farm after Jackson paid the necessary taxes and insurance; Jackson was also ordered to reimburse Strong for CRP payments received during the course of the litigation and not paid to Strong. The trial court also concluded, however, that the personal property sale was an arms length transaction and not the result of constructive fraud. The trial court also subsequently awarded Jackson's trial counsel attorney fees related to the temporary restraining order that prevented Jackson from disposing of the personal property. It awarded counsel $1255.50 for those fees and, in a separate judgment, deducted that amount from the $4777.45 Jackson owed Strong for the CRP payments, resulting in a net judgment to Strong in the amount of

---

**2.** The record does not reveal what a "CRP" payment is. We assume this refers to the Farm Service Agency's Conservation Reserve Program, which pays annual rent to landowners for planting permanent vegetation on idle, highly erodible farmland. *See* Farm Service Agency Online—Conservation, *at* http://www.fsa.usda.gov/dafp/cepd/crpinfo.htm.

$3521.95. Strong now appeals, and Jackson effectively cross-appeals.

### Analysis

 At Strong's request, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). In reviewing a judgment where findings and conclusions have been entered, we first must determine whether the evidence supports the findings and second, whether the findings support the judgment. *Albright v. Bogue*, 736 N.E.2d 782, 787 (Ind.Ct.App.2000). Findings of fact are clearly erroneous only when the record lacks any evidence to support them. *Id.* In reviewing the findings and judgment entered by the trial court, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* If a party has requested specific findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Id.* at 789. Before affirming on a legal theory supported by the findings but not espoused by the trial court, the reviewing court should be confident that its affirmance is consistent with all of the trial court's findings of fact and inferences drawn from the findings. *Id.*

### I. Constructive Fraud—Real Estate Transaction

 We begin by assessing Jackson's claim that the trial court erred in concluding that constructive fraud had occurred in relation to the real estate transfer. Constructive fraud arises by operation of law from a course of conduct, which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *Drudge v. Brandt*, 698 N.E.2d 1245, 1250 (Ind.Ct.App.1998). There are essentially two lines of cases in Indiana regarding constructive fraud.

One simply lists the five elements of constructive fraud: "(i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party." *See, e.g., Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind.1996).

On the other hand, there are numerous cases that, without mentioning these five elements, hold as follows:

> In Indiana, various legal and domestic relationships raise a presumption of confidence and trust as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other. *Lucas v. Frazee*, 471 N.E.2d 1163, 1166 (Ind.Ct.App.1984). These relationships include, among others, principal and agent. *Id.* at 1166–67. Where the relationship is one of principal and agent, if the plaintiff's evidence establishes (a) the existence of a fiduciary relationship, and (b) the questioned transaction between the two (2) parties resulted in an advantage to the dominant party in whom the subordinate party had reposed both their trust and confidence, "the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void." *Id.* at 1167. Once these facts are established, the burden shifts to the dominant party in the relationship to rebut the presumption by clear and unequivocal proof. *Id.*

*In re Estate of Wade*, 768 N.E.2d 957, 961–62 (Ind.Ct.App.2002), *trans. denied; see*

*also Matter of Good,* 632 N.E.2d 719, 721 (Ind.1994) ("Transactions entered into during the existence of a fiduciary relationship are presumptively invalid as the product of undue influence."); *Reiss v. Reiss,* 516 N.E.2d 7, 8 (Ind.1987) (holding that in certain relationships, including principal and agent, the law raises a presumption of influence upon the subordinate party by the dominant party); *Clarkson v. Whitaker,* 657 N.E.2d 139, 144 (Ind.Ct.App. 1995), *trans. denied* ("The law presumes fraud when a person with a fiduciary duty benefits from a questioned transaction."). Strong urges that a presumption of fraud arose in this case; Jackson cites the five-part *Rice* analysis as the proper test without addressing the burden-shifting aspect of cases like *Wade* and *Lucas.*

■ We hold, pursuant to the holding expressed in *Wade* and *Lucas,* that a plaintiff alleging the existence of constructive fraud has the burden of proving the first and last elements enumerated in *Rice:* a duty owing by the party to be charged to the complaining party due to their relationship, and the gaining of an advantage by the party to be charged at the expense of the complaining party. The duty mentioned in the first element may arise in one of two ways: by virtue of the existence of a fiduciary relationship, or in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other. *Epperly v. Johnson,* 734 N.E.2d 1066, 1073 (Ind.Ct.App.2000). If the plaintiff meets the burden of proof with respect to those two elements and establishes the existence of a fiduciary relationship, the burden shifts to the defendant to disprove at least one of the second, third, and fourth elements of *Rice* by clear and unequivocal proof: no making of deceptive material misrepresentations of past or existing facts or remaining silent when

a duty to speak exists, no reliance thereon by the complaining party, or no injury to the complaining party as a proximate result thereof. We observe, however, that in a constructive fraud action based on misrepresentations between a buyer and a seller and not the existence of a fiduciary relationship, no presumption of fraud arises and the burden is on the plaintiff to prove all five elements of the *Rice* test.

The trial court's findings and conclusions do not indicate that it precisely followed the above analysis. It listed a paraphrasing of the five *Rice* elements of constructive fraud without indicating that a presumption of constructive fraud arose in this case or that Jackson had the burden of refuting such a presumption. We may affirm this judgment on any legal theory consistent with the trial court's findings, however, and are confident that we can do so with respect to this issue by applying the constructive fraud test we have outlined to the facts found by the trial court.

■ We begin by noting our earlier decision in *Strong v. Strong,* in which we affirmed an award of attorney fees in favor of Gary and against Strong for bringing a frivolous claim, and where we stated "that Lloyd is a stubborn, uncooperative man." Slip op. p. 13. There is little in the record in the present case that would cause us to modify that observation. As an example, he testified under oath at the May 13, 1998 DeKalb County hearing on Gary's attempts to collect the judgment that he had no assets with which to pay it, but testified at the trial in this case that he had had $45,000 in cash with which to pay the judgment as of June 18, 1998, without explaining his May 13, 1998 testimony or how he might have acquired that much cash in a little over a month.

■ Jackson, however, does not dispute the trial court's finding that "the facts

clearly and convincingly reflect a relationship of continuous trust and confidence [by Strong in Jackson] beyond the formality of the Power of Attorney." Appellant's App. p. 19. This supports the conclusion that Strong adequately proved the first element of the *Rice* test, a duty owing by the party to be charged to the complaining party due to their relationship. It also establishes the existence of a fiduciary relationship between Jackson and Strong. "[A] confidential or fiduciary relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *Estates of Kalwitz v. Kalwitz*, 717 N.E.2d 904, 914 (Ind.Ct.App.1999). We have previously recognized that the relationship between an attorney-in-fact and his or her principal is a fiduciary one. *Villanella v. Godbey*, 632 N.E.2d 786, 790 (Ind.Ct.App.1994). Additionally, although the trial court entered no specific finding on whether Jackson gained an advantage from the transaction, he makes no claim on appeal that he did not gain such an advantage.[3] Thus, Jackson essentially concedes that Strong adequately proved the fifth element of the *Rice* test.

The question then becomes whether Jackson presented clear and unequivocal evidence to rebut one of the three remaining constructive fraud elements found in *Rice*. The trial court's ultimate findings regarding these three elements of material misrepresentation, reasonable reliance thereon, and resulting injury to Strong are summarized in its "Conclusions," numbers 11 and 13:

> Plaintiff has proven the existence of all elements required for constructive fraud and the existence of all elements re-

quired for a breach of a confidential or fiduciary relationship by [Jackson's] accepting transfer of the real estate without securing a life estate for Plaintiff, Lloyd Strong.

\*　　\*　　\*　　\*　　\*　　\*

> Defendant, Steve A. Jackson, told Plaintiff that Plaintiff could continue to live on the Steuben County Farm and that Defendant would give Plaintiff the balance of the CRP money after Defendant paid the taxes and insurance for the Steuben County Farm. However, the Defendant, Steve A. Jackson, testified that he cannot be sure whether he told Plaintiff this before or after the conveyance on June 18, 1998. He testified that his wife told him it was prior to June 18th. At any rate, he testified that he was "definitely committed to it." Findings are entered that the preponderance of the evidence is that the statement occurred prior to the conveyance on June 18th.

Appellant's App. p. 22.

Much of Jackson's argument that he made no material misrepresentation or that Strong did not reasonably rely on the promise that he could live out his life on the farm is based on the involvement of attorney Allen Stout in this transaction. Indeed, the trial court does refer to Stout as "Plaintiff's attorney" in its findings, and Stout had represented and given advice to Strong in his ongoing legal battles with Gary. However, Stout testified at his deposition, which was introduced into evidence, that he viewed his role in this transaction as merely a scrivener, and that "[w]hat [Strong's and Jackson's] price was and what their agreement was was really none of my business." Appellant's App. p. 519.

---

**3.** Evidence in the record estimated the value of the Steuben County farm on June 18, 1998, as $153,000, and the value of Strong's personal property on that date as $45,335; Jackson, therefore, received property worth nearly $200,000 in consideration for his payment of a $41,268.85 judgment against Strong.

Furthermore, after Strong told Stout that he was going to transfer the farm to Jackson and that Jackson had promised him he could continue to live there for the rest of his life, Stout called Jackson to confirm this plan. Jackson did so, but also stated, after being asked by Stout, that he would not accept the farm with a life estate to Strong attached to it. There is no evidence Stout ever related this comment or its legal importance to Strong, and Stout drafted the warranty deed without reserving a life estate to Strong as directed by Jackson and contrary to what Strong believed the transaction would entail. Stout also testified in his deposition, "I don't know that I pointed out to [Strong] the absence of a life estate." Appellant's App. p. 490. It is clear to us that Stout's involvement in this transaction was insufficient to remove the taint of constructive fraud.

Jackson also contends he made no misrepresentation that Strong could have reasonably relied upon regarding the reservation of a life estate to Strong. He bases this argument on the fact that the warranty deed itself makes no mention of a life estate and apparently on the fact that Jackson did not use the words "life estate" when promising Strong that he could continue to live on the farm as long as he wished. He also points out that Stout had advised Strong, before he signed the warranty deed, that Jackson would thereafter own everything, "including the kitchen sink." Tr. p. 816.

■ We are not persuaded that Jackson did not make a material misrepresentation, or that Strong did not reasonably rely upon such a misrepresentation. It is well-settled that although an oral promise as to future conduct will not support an ordinary fraud action, such promise may form the basis of a constructive fraud action if it induces one to place himself in a worse position than he would have been in had no promise been made and if the party making the promise derives a benefit as a result of the promise. *See Kalwitz,* 717 N.E.2d at 913; *Farrington v. Allsop,* 670 N.E.2d 106, 109 (Ind.Ct.App.1996). "For example, a constructive trust may arise where there is a confidential relationship between the grantor and the grantee, and the grantor relies upon the transferee's promise to reconvey the property in the future." *Kalwitz,* 717 N.E.2d at 913.

Here, the trial court specifically rejected Strong's assertion that Jackson made a promise to reconvey the farm, but did accept that Jackson had promised to allow Strong to continue to live on the farm for the rest of his life. It is also reasonable to infer that this promise was a decisive factor that induced Strong to transfer title to the property to Jackson. We conclude it is of little relevance that Jackson did not use the term of art "life estate" when promising Strong that he could live on the farm for as long as he lived, even after the property was transferred to Jackson. Regardless of what Jackson said precisely, it is clear that he promised Strong the equivalent of a life estate in the farm. We also believe the fact that the warranty deed does not mention a life estate does not negate the existence of constructive fraud as a matter of law. The very essence of a constructive fraud action based on the existence of a fiduciary relationship is that one party places a special trust and confidence in a dominant party and, therefore, it is presumed that a transaction entered into during such a relationship is not an arms length transaction, wherein each party would be bound to closely examine the terms of the contract to protect his or her interests rather than relying on a fiduciary's representations. We also are unconvinced that Stout's advice to Strong before he signed the deed renders Strong's reli-

ance on Jackson's promise unreasonable. Strong's knowledge that Jackson would "own" all of his property after he signed the warranty deed and bill of sale does not necessarily equal knowledge that he would be left with no interest in the property whatsoever, e.g. a life estate.

Finally, Jackson seems to argue that Strong was not injured by this transaction because Jackson had allowed Strong to live on the farm as promised and took no action to force Strong off the farm until Strong called the transaction into question.[4] We acknowledge that, up until August 9, 1999, Jackson had permitted Strong to reside on the farm as he had promised; it was only after this date that Jackson attempted to force Strong off the property. Strong, therefore, is not entirely without blame as to his current predicament. Nevertheless, the fact that Jackson legally could force Strong off the property, under the contract as originally written, highlights the worthlessness of Jackson's promise where the warranty deed did not reserve a life estate in the property to Strong. The promise was wholly dependent on Strong's remaining on good terms with Jackson and left Strong without legal recourse if Jackson ever decided to renege on his promise. We hold that Jackson has failed to establish by clear and unequivocal evidence that his acceptance of Strong's real property without reservation of a life estate to Strong, as effectively promised, did not result in injury to Strong. In sum, the trial court's findings on the issue of the transfer of the real estate are not clearly erroneous, and the trial court did not err in concluding that those findings established the existence of constructive fraud with respect to that transfer.

4. One week after Strong's counsel requested that Jackson reconvey the property to Strong, Jackson's counsel responded with a letter stating "Mr. Jackson has elected to terminate your occupancy of the above-described prem-

## II. Constructive Fraud—Remedy

 Next, we address whether the trial court ordered an appropriate remedy after it concluded that the real estate transfer from Jackson to Strong was the result of constructive fraud. Strong contends that once the trial court found the existence of constructive fraud, it could not simply order reformation of the warranty deed by granting Strong a life estate in the property. Rather, he claims, the trial court should have declared the entire transaction "void," which we take to mean the contract should have been ordered entirely rescinded or a constructive trust should have been imposed. It is true some cases state that a transaction resulting from constructive fraud is deemed "void." *Wade*, 768 N.E.2d at 963. The use of the word "void," however, should not be read as limiting the remedies available after a finding of constructive fraud to rescission or imposition of a constructive trust.

 It is axiomatic that "[a] court of equity has jurisdiction to reform written documents." *Peterson v. First State Bank*, 737 N.E.2d 1226, 1229 (Ind.Ct.App. 2000). Although reformation is an extreme remedy, it may be appropriate (1) where there is a mutual mistake such that the written instrument does not reflect what the parties truly intended; and (2) where there has been a mistake on the part of one party accompanied by fraud or inequitable conduct by the other party. *Id.* The second of these situations is applicable here.

 It is true that fraud in the inducement of a contract may also be a basis for rescission. *Hart v. Steel Prod-*

ises." Plaintiff's Ex. 45. Jackson did not pursue this course of action following the parties' agreement on Strong's request for a preliminary injunction.

*ucts, Inc.*, 666 N.E.2d 1270, 1275 (Ind.Ct. App.1996), *trans. denied.* The remedy of rescission only entitles a plaintiff to be returned to the status quo, which usually necessitates a return of money or other things received or paid under the contract, plus reimbursement as special damages, for any reasonable expenditures incurred as a proximate result of the fraudulent conduct. *Id.* The rescinding party must also restore all benefits received under the contract. *Id.* Finally, a constructive trust may be imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. *Kalwitz,* 717 N.E.2d at 912 (quoting *Melloh v. Gladis,* 261 Ind. 647, 656, 309 N.E.2d 433, 438–39 (1974)). "The duty to convey the property may [a]rise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property." *Id.* As an equitable remedy, one seeking imposition of a constructive trust would be bound by the equitable principle, "he who seeks equity must do equity." *Alber v. Standard Heating & Air Conditioning, Inc.,* 476 N.E.2d 507, 510 (Ind.Ct.App.1985). As with rescission, we conclude this would require a plaintiff to return benefits received from a defendant, if any, before a constructive trust on property transferred to a defendant could be imposed.

█ The trial court here had good reason to order the remedy it did, rather than ordering a complete rescission of the contract or imposing a constructive trust. Either rescission or a constructive trust would have required Strong to return to Jackson the benefit that Strong had received under the contract, namely, Jackson's paying the outstanding judgment against Strong. The very transfer of the property to Jackson arose because of either Strong's inability or unwillingness to pay an outstanding judgment in favor of his son and the threat of a possible sheriff's sale of the property to satisfy that judgment. Given the background of this case, it was entirely reasonable for the trial court to reform the contract by granting Strong a life estate in the real property rather than rescinding the contract, which would result in Strong being required to reimburse Jackson for the $41,268.85 he paid to satisfy the judgment and which history indicates would be difficult to collect. A plaintiff seeking rescission of a contract bears the burden of proving the ability and willingness to reimburse a defendant for any benefits received under the contract. *See Hart,* 666 N.E.2d at 1275. Strong did not meet that burden. In fact, we find several pages of testimony in which Strong's attorney unsuccessfully attempted to elicit Strong's agreement to reimburse Jackson for the judgment he paid to Gary if the contract was rescinded.

Unlike many constructive fraud cases, this is not an instance where the victim of the fraud received absolutely nothing or very little in return for a transfer of property to the fiduciary. It is undisputed that Jackson paid the $41,268.85 judgment Strong owed to Gary after Strong transferred the property to Jackson. By doing so, Strong avoided losing the farm in a sheriff's sale, the process for which Gary's attorney had begun and which he testified he was definitely going to pursue. In addition to this material benefit Strong received from transferring his real property to Jackson, Strong received the visceral pleasure of knowing Gary could not take possession of that property, as revealed by his comments when the property was transferred to the effect that if he had no property, Gary could not get it. Given these intangible factors, we cannot say Jackson was unjustly enriched by the

transfer of the real property if Strong is reserved a life estate in the property. The trial court did not err by reforming the real estate contract, rather than rescinding it or imposing a constructive trust.[5]

### III. Constructive Fraud—Personal Property Transaction

Finally, Strong contends it was fundamentally inconsistent for the trial court to conclude on the one hand that the real property transfer was the result of constructive fraud, and on the other hand that "the transfers of the related personal property were an arm's length transaction." Appellant's App. p. 19. We reiterate our earlier holding: to establish the presumption of constructive fraud, a plaintiff must prove (1) a duty owing by the party to be charged to the complaining party due to their relationship and (2) the gaining of an advantage by the party to be charged at the expense of the complaining party. If those two elements are proven, and the relationship between the parties is a fiduciary one, the burden shifts to the defendant to establish by clear and unequivocal evidence that (1) no material misrepresentations were made in violation of the duty owing to the plaintiff, (2) the plaintiff did not reasonably rely on any such misrepresentation, *or* (3) the plaintiff was not injured by the transaction.

In the trial court's view, there was one distinguishing characteristic between the real estate and personal property transactions related to the element of whether any material misrepresentations were made that induced Strong to enter into those transactions with Jackson. Specifically, although it found that Jackson had told Strong, prior to the conveyance of the real property, that he could continue to live on the farm for the rest of his life, it also found "[n]o evidence exists that promises were made regarding the personal property or the Plaintiff's continued use of it." Appellant's App. p. 23. In other words, the trial court concluded that Jackson established he made no material misrepresentation in violation of his fiduciary duty to Strong with respect to the personal property.

Our review of the record reveals that some evidence *does* exist that promises were made regarding Strong's continued use of the personal property. Attorney Stout testified in his deposition, which we emphasize *was* introduced into evidence, as follows:

> Q: ... Was there a reason that you were given why Mr. Strong was giving

---

5. We also observe, although not specifically found by the trial court, that in calculating the monetary circumstances of this transaction, it is not enough to simply state that Jackson received real property with an estimated value of $153,000 on June 18, 1998, in exchange for $41,268.85, because the $153,000 number was based on two assumptions that do not apply in this case. First, the appraisal is apparently based on the property's "market value," defined as "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus." Plaintiff's Ex. 32. Second, the appraisal is also apparently based upon a "fee simple interest in the site." *Id.* Here,

Gary's attorney was proceeding with due speed to subject the Steuben County farm to a sheriff's sale in order to satisfy the judgment; it is almost certain that a sheriff's sale of the property would not have resulted in the "market price" of the property given the above definition of that term. Additionally, the reservation of a life estate in the property to Strong also would certainly affect the value of the property to Jackson, as he would have a remainder interest in it, not a fee simple. Finally, Strong would not have had the option of retaining a life estate in the property if it had been sold at a sheriff's sale. By transferring the property to Jackson, Strong avoided the sheriff's sale, which would have resulted in the loss of all his interest in the property and, most likely, a sale price well below the property's "market value."

over not only his real estate but all of the personal property to Mr. Jackson? A: Yes.... He explained to me that by doing that he was going to be able to continue to use the property *and enjoy the property, continue to mow his farm with his machinery,* live on the farm, still have the income from the farm and Gary Strong was going to get nothing.

\* \* \* \* \* \*

My client told me he was going to get to live on the property and that, *the rest of his life and he would be able to run his tractors and play with his lawnmowers* and that he would get all of the income from the property.

Appellant's App. pp. 473, 523 (emphases added). Thus, there is evidence in the record that Jackson promised Strong the continued use of his personal property, at least with respect to farm machinery, in conjunction with his continuing to live on the real property. We also observe that a promise to Strong that he could live out his life in the farmhouse where he had lived for many years would seem to carry an implied promise that he could continue to use household items of personal property. Furthermore, we note that much of the evidence regarding the real estate transfer, which the trial court found was constructively fraudulent, overlaps and is in many respects identical with the evidence regarding the personal property transfer, which it found was not constructively fraudulent. The trial court's finding of "no evidence" of any promise with respect to the personal property is thus, by our standard of review, clearly erroneous.

■ It would be improper for us to judge the weight and significance of this evidence and conclude, as a matter of law,

that Jackson has failed to establish by clear and unequivocal evidence that he made no misrepresentations with respect to the personal property or that Strong did not reasonably rely on any such misrepresentations. That being the case, we reverse that part of the trial court's judgment concerning the personal property transfer and remand for the trial court to reconsider whether the transfer of Strong's personal property to Jackson was the result of constructive fraud. Given the constructive fraud finding with respect to the real property transfer and the existence of some evidence of alleged promises regarding the personal property, we believe that further clarification and explanation regarding the personal property transfer is necessary. Additionally, we instruct the trial court to apply the constructive fraud analysis we have outlined in this opinion: it would appear Strong has already established that Jackson owed a fiduciary duty to him and that Jackson benefited from the personal property transaction. Thus, the burden is Jackson's to establish that that transaction was not constructively fraudulent by clear and unequivocal evidence that he made no material misrepresentations concerning the personal property, that Strong did not reasonably rely on any such representation, or that Strong was not injured by the transaction. We leave it to the trial court's discretion as to whether a new hearing on this issue should be held or whether it may amend its findings, conclusions, and judgment in accordance with this opinion based on the evidence it has already received.[6]

## Conclusion

We affirm the trial court's judgment finding the existence of constructive fraud

6. Our reversal and remand on this issue necessarily reverses the award of attorney fees to Jackson's trial counsel based on his defense of the temporary restraining order Strong obtained to prevent Jackson from disposing of the personal property, because the award was based on this issue's resolution in Jackson's favor. Because of our reversal and remand

with respect to Strong's transfer of his real property to Jackson as well as the trial court's remedy of reforming that transaction by granting Strong an equitable life estate in the property. However, we find that the trial court's primary finding supporting its conclusion that there was no constructive fraud with respect to the personal property transaction is clearly erroneous. We reverse the trial court's judgment on this issue and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

BAKER, J., and VAIDIK, J., concur.

on this issue, we need not definitively resolve today whether the trial court improperly awarded attorney fees. Jackson points to Indiana Trial Rule 65(C), however, as authorizing an award of attorney fees when a party is wrongfully enjoined. *See GKC Indiana Theatres, Inc. v. Elk Retail Investors, LLC,* 764 N.E.2d 647, 654 (Ind.Ct.App.2002). Strong seems to argue that the restraining order in this case should not be considered "wrongful" because it was dismissed pursuant to an agreement between the parties. He cites no authority for his argument, however, thus waiving any argument on this point. *See Jackson v. State,* 735 N.E.2d 1146, 1154 (Ind. 2000).

We also note that the parties agree on appeal that if the attorney fees to Jackson's counsel were properly awarded, the trial court erred by both awarding them to counsel in one judgment and deducting that same amount from another judgment owing to Strong, thus effectively requiring Strong to pay those fees twice.