**AMERICAN HERITAGE BANCO, INC., Appellant–Plaintiff,**

v.

**Arthur W. CRANSTON and Joanne E. Cranston, First Federal Savings and Loan Association of Huntington, and Fifth Third Bank, Appellees–Defendants.**

No. 76A04–0907–CV–384.

Court of Appeals of Indiana.

June 9, 2010.

Rehearing Denied Aug. 4, 2010.

Martin T. Fletcher, Sr., Daniel G. McNamara, Eilbacher Fletcher, LLP, Fort Wayne, IN, Attorney for Appellant.

Dane L. Tubergen, Todd P. Gilbert, Hunt Suedhoff Kalamaros, LLP, Fort Wayne, IN, Attorney for Appellees Arthur W. Cranston and Joanne E. Cranston.

## OPINION

CRONE, Judge.

### Case Summary

American Heritage Banco, Inc. ("AHB"), appeals the trial court's judgment in favor of Arthur W. and Joanne E. Cranston ("the Cranstons") on AHB's mortgage foreclosure claim and claim for damages on a promissory note against the Cranstons. The trial court denied AHB's claims for relief and instead entered judgment in favor of the Cranstons on the Cranstons' affirmative defense and counterclaim for constructive fraud against AHB. The trial court also awarded treble damages and attorney fees to the Cranstons pursuant to the Indiana Crime Victim's Relief Act, Indiana Code Section 34–24–3–1. We reverse and remand.

### Issue

AHB presents several issues for our review, one of which is dispositive: whether the trial court clearly erred in determining that AHB is liable for all the Cranstons' monetary losses based upon a theory of constructive fraud.

### Facts and Procedural History

First National Bank of Fremont ("FNBF") was a federally chartered bank located in Fremont, Indiana, and AHB was an Indiana bank holding corporation with its principal place of business also in Fremont. FNBF was a wholly owned subsidiary of AHB from 1995 to November 1, 2005, when FNBF was merged into AHB.[1] During all times relevant to the issues presented in this appeal, AHB was a closely held corporation of which Earl Ford McNaughton was the president and majority shareholder. McNaughton was also the president, chairman of the board of directors, and chief executive officer of FNBF. David Schimmele was senior vice president and a director of FNBF and a director of AHB. Anne Mounts was the treasurer of FNBF and a director of AHB.

In January of 2002, McNaughton asked Luanne Putnam, a local licensed real estate appraiser, to prepare an appraisal of a

---

1. AHB has since changed its name to "American Heritage Collector, Inc." Appellant's App. at 349. Nevertheless, we will refer to it as AHB for purposes of this appeal.

tract of land owned by Inveraray, Inc., ("Inveraray"),[2] an Indiana corporation owned by McNaughton. The tract of land comprised of 117 acres of undeveloped land in Steuben County ("Inveraray property"). McNaughton requested of Putnam an appraisal which would show the "highest possible value" of the land based upon the possibilities for development of the property as opposed to simply the fair market value of the property. Appellant's App. at 625–38. Putnam prepared an appraisal for McNaughton, dated February 2, 2002, which gave an "estimated market value" of $642,000 for "residential development" of the Inveraray property. Appellant's App. at 579–80.

The Cranstons were longstanding customers of FNBF and were acquainted with McNaughton, Schimmele, and Mounts. The Cranstons had extensive experience in the real estate business and had been involved for many years in real estate transactions and development in Steuben County. Prior to the Cranstons' relocation to Alabama in the late 1990s, Joanne Cranston owned and operated a real estate title company. On two occasions, the Cranstons had been involved in business transactions with McNaughton whereby the Cranstons bought property, leased it back to McNaughton for a term, and then sold the property back to McNaughton.

In February 2002, Schimmele telephoned Arthur Cranston to solicit the Cranstons' interest in a real estate transaction with McNaughton regarding the Inveraray property. Specifically, Schimmele informed the Cranstons that "[McNaughton] is going to do another one." Appellees' App. at 45. Schimmele proposed in

pertinent part that: (1) the Cranstons purchase the Inveraray property from McNaughton for $642,000; (2) the property would be deeded to the Cranstons; (3) the Cranstons would lease the property to McNaughton for a period of thirty months, at the end of which McNaughton would repurchase the property for $642,000; and (4) McNaughton would arrange for all necessary financing through a third-party bank and would make all necessary payments on the loan used to finance the Cranstons' purchase.[3] In exchange for their agreement to the lease proposal, the Cranstons would receive a profit of five percent of the total purchase price of the property, payable quarterly, over the thirty-month term of the lease. The Cranstons were advised that the transaction would provide certain unspecified tax advantages to McNaughton while at the same time providing profit to them. Schimmele advised the Cranstons that they would have no out-of-pocket expenses and would have to do nothing other than sign some papers. Schimmele informed the Cranstons that McNaughton wished to keep the transaction confidential, but assured them that the transaction was "kosher" or "legal." Appellant's App. at 83. The Cranstons agreed to the proposed transaction.

Thereafter, arrangements were made for the Cranstons to finance the purchase of the Inveraray property through First Federal Savings Bank of Huntington ("First Federal"). Aware that First Federal would require an appraisal of the Inveraray property prior to financing the deal, McNaughton had his secretary, Anne

---

**2.** We note that, in its findings, the trial court refers to "Inverarary, Inc." Our review of the record reveals that the correct spelling is "Inveraray, Inc."

**3.** Although the final lease/purchase-back agreement involved the Cranstons and Inveraray, during his conversations with the Cranstons, Schimmele described the transaction as involving McNaughton and did not specifically identify Inveraray as a party.

Mounts, contact Putnam, the appraiser who had previously appraised the property for McNaughton. At Mounts's direction, Putnam changed the cover page of the previous appraisal to indicate that the appraisal was prepared for First Federal, rather than McNaughton, and that the Cranstons were to be the borrowers. The appraisal was not changed in any other way and still reflected an "estimated market value" of $642,000 for "residential development" of the Inveraray property. Mounts forwarded the appraisal along with the Cranstons' personal financial information to First Federal.

First Federal only agreed to lend the Cranstons 80% of the $642,000 purchase price, or $513,000. Schimmele informed the Cranstons that they needed to make a down payment on the loan of the other 20%, or around $128,000. The Cranstons refused to be out-of-pocket any money. Schimmele suggested to the Cranstons that McNaughton could have FNBF lend $128,000 to the Cranstons but informed the Cranstons that the loan would need to be secured by a mortgage on the Cranstons' million-dollar residence on Lake George in Steuben County.[4] The Cranstons agreed to the arrangement.

In April 2002, McNaughton telephoned the Cranstons in Alabama to see if they could come to Indiana to close the transaction. They did not discuss any details about the transaction during that telephone call. Because the Cranstons were not planning to return to Indiana in the near future, McNaughton insisted that closing agents travel to Pensacola, Florida, to meet with the Cranstons and handle the closing. On April 9, 2002, the closing occurred. During closing, the Cranstons signed two sets of documents. One set of documents was prepared by the title company for First Federal regarding the Inveraray property and included a promissory note to First Federal in the amount of $513,000 secured by a mortgage on the Inveraray property. The other set of documents was prepared by employees of FNBF and included a promissory note payable to FNBF for $128,872.32 secured by a mortgage on the Cranstons' Lake George property. Also at closing, the Cranstons executed a third promissory note, dated March 29, 2002, to FNBF in the amount of $128,433. The Cranstons glanced at all documents prior to signing but elected not read the entirety of the documents prior to execution.

Regarding note dated March 29, 2002, FNBF issued a loan proceeds check payable to the Cranstons for $128,433. Although the Cranstons do not recall executing this note at the closing, the loan proceeds check was stamped on its endorsement area to indicate that the Cranstons had authorized its endorsement and deposit. The proceeds check was then used to issue cashier's checks, which were credited to McNaughton. McNaughton used those credited funds, along with other personal funds, to pay off a series of student loans with FNBF for his children. The use of these funds by McNaughton occurred unbeknownst to the Cranstons. Following the April 9, 2002, closing, the $128,000 "down payment" loaned to the Cranstons by FNBF was used to pay off the March 29, 2002, note.

During the thirty-month term of the parties' agreement, the Inveraray transaction proceeded as anticipated. Inveraray and/or McNaughton made all payments on the First Federal and FNBF loans. The

4. Although the Cranstons had relocated to Alabama, they maintained a residence in Steuben County.

Cranstons received their quarterly lease payments from Inveraray and/or McNaughton of $8,031, resulting in total payments to the Cranstons of $80,310. In October of 2004, Schimmele contacted the Cranstons to inquire about an extension of the lease. The Cranstons agreed to a one-year extension on the assumption that the lease would continue to be profitable. However, also in October, an audit of FNBF revealed numerous questionable banking transactions. The Cranstons were aware of the audit and contacted McNaughton to make sure that they would never have to pay on the FNBF note. Several FNBF directors and employees, including McNaughton, Schimmele, and Mounts, all resigned. Prior to his resignation, McNaughton assured the Cranstons that, if FNBF later merged with AHB, the April 9, 2002, promissory note would be canceled. The note was not canceled and became the property of AHB in November of 2005 when FNBF merged into AHB.[5]

On November 1, 2006, AHB filed its complaint to foreclose and collect on the April 9, 2002, promissory note against the Cranstons.[6] On January 26, 2007, the Cranstons filed their answer, affirmative defenses and counterclaim. On July 18, 2007, the Cranstons filed their supplemental counterclaim. A bench trial on all claims was held on December 29 and 30 of 2008, and on January 5, 2009. On March 25, 2009, the trial court entered extensive findings of fact and conclusions thereon. In sum, the court concluded that AHB had shown that the April 9, 2002, promissory note executed by the Cranstons was indeed in default for nonpayment.[7] However, the court determined that the Cranstons proved by a preponderance of the evidence that McNaughton engaged in constructive fraud, which "vitiated the vitality" of the transaction surrounding the note "from its inception." Appellant's App. at 21. The trial court further determined that, although McNaughton had no actual or apparent authority to engage the Cranstons in any business transaction such that FNBF, and now AHB, could be held vicariously liable for McNaughton's constructive fraud, FNBF ratified McNaughton's fraudulent conduct and, therefore, is estopped from denying liability. Accordingly, the trial court denied AHB's claims for relief and instead entered judgment in favor of the Cranstons on their counterclaim for constructive fraud in the amount of $200,542.56, which included some treble damages pursuant to Indiana Crime Victim's Relief Act, Indiana Code Section 34–24–3–1. The case was set for a hearing on the issue of attorney fees for May 14, 2009. Following a hearing, the trial court awarded the Cranstons attorney fees pursuant to Indiana Code Section 34–24–3–1 in the

5. When it became necessary, the Cranstons began making payments on their note to First Federal and arranged to liquidate the Inveraray property, which served as collateral for that note. The Inveraray property was parceled and eventually sold for a total of $337,807.90. Due to the shortfall between the net sale proceeds and the outstanding balance on the note, the Cranstons executed a mortgage to First Federal on their Lake George property.

6. The complaint also named First Federal and Fifth Third Bank as defendants because they, in addition to AHB, hold mortgages on the Cranstons' Lake George property. However, the parties stipulated to the trial court that First Federal and Fifth Third have no interest in the current proceedings other than to seek priority of their respective liens. Appellant's App. at 324. While they have chosen not to file briefs with this court, they nonetheless are parties of record and are therefore parties on appeal. *See* Ind. Appellate Rule 17(A).

7. The Cranstons did in fact make two payments on their note payable to FNBF, totaling $5,404.90, but later stopped making payments and became in default.

amount of $70,778.55. On June 22, 2009, the trial court denied AHB's motion to correct error. This appeal ensued.

### Discussion and Decision

The trial court entered findings of fact and conclusions thereon against AHB and in favor of the Cranstons on the Cranstons' counterclaim for constructive fraud. Generally, when the trial court enters findings of fact and conclusions thereon, its findings and conclusions shall not be set aside unless clearly erroneous. *Shady v. Shady*, 858 N.E.2d 128, 140 (Ind.Ct.App. 2006), *trans. denied.* Because the Cranstons bore the burden of proof on their counterclaim, AHB now appeals an adverse judgment. An adverse judgment is one that is entered against a party that did not bear the burden of proof on a given question. *Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 411 (Ind.Ct.App. 2002), *opinion on reh'g, trans. denied.* On appeal from an adverse judgment, the findings are clearly erroneous if they are not supported by substantial evidence of probative value. *Romine v. Gagle*, 782 N.E.2d 369, 376 (Ind.Ct.App.2003), *trans. denied.* Moreover, we will reverse the judgment even where the supporting evidence is substantial, if we are left with a definite and firm conviction that a mistake has been made. *Id.*

AHB asserts that the trial court clearly erred in determining that, although the Cranstons were clearly in default for nonpayment of their note to AHB, the Cranstons had proved their counterclaim for constructive fraud and, therefore, were entitled to damages against AHB. Specifically, AHB contends that the trial court's finding that McNaughton owed a duty to the Cranstons due to a special relationship between the parties such that AHB could be vicariously liable for McNaughton's conduct was clearly erroneous. We agree with AHB.

Constructive fraud arises by operation of law from a course of conduct, which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *Strong v. Jackson*, 777 N.E.2d 1141, 1146 (Ind.Ct. App.2002), *trans. denied.* The elements of constructive fraud are: (1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind.1996). In constructive fraud, the law infers fraud from the relationship of the parties and the circumstances which surround them. *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind.Ct.App.1994), *trans. denied.*

For the Cranstons' counterclaim alleging constructive fraud to succeed, the Cranstons first had the burden to prove that AHB, through McNaughton, owed a duty to the Cranstons by virtue of the relationship between the parties. The record is clear that McNaughton and the Cranstons were acquaintances whose relationship was premised upon the Cranstons being customers of FNBF. As acknowledged by the trial court, " 'the mere existence of a relationship between parties of bank and customer or depositor does not create a special relationship of trust and confidence.' " *Sees v. Bank One, Indiana, N.A.*, 839 N.E.2d 154, 164 n. 8 (Ind.2005) (quoting *Huntington Mortgage Co. v. DeBrota*, 703 N.E.2d 160, 167 (Ind.Ct.App. 1998)).

Still, the trial court concluded that the relationship between McNaughton and the Cranstons was much more than the typical lender/borrower relationship. The trial court's findings indicate that the trial court premised its conclusion that a special relationship existed between McNaughton and the Cranstons based upon evidence that McNaughton and the Cranstons had jointly embarked on what the trial court termed as "mutually beneficial" business transactions on two prior occasions. Appellant's App. at 22. The evidence in the record is incredibly sparse regarding these two prior transactions. The record indicates that one transaction involved the sale, lease, and repurchase of office equipment belonging to FNBF. The other transaction involved the sale or lease of a building owned by McNaughton or one of McNaughton's relatives. Arthur Cranston testified that he could not recall exactly how McNaughton was involved in the two prior transactions, nor could he recall any of the terms of those transactions. Tr. at 113–15, 218–20. He seemed only to recall that he made some money on those deals. This is the only evidence relied upon by the trial court to support its finding that a special relationship existed between McNaughton and the Cranstons. Our review of the record fails to reveal, and the Cranstons fail to direct us to, any additional evidence that could have been relied upon by the trial court to support its finding that McNaughton and the Cranstons had any sort of special or fiduciary relationship involving AHB that would remove their dealings from an ordinary arms-length business transaction. This court has declined to hold that a positive business experience, without more, necessarily gives rise to fiduciary obligations in future transactions between the same parties. *Epperly v. Johnson,* 734 N.E.2d 1066, 1077 (Ind.Ct.App.2000). The trial court's finding that a special or fiduciary relationship existed between McNaughton and the Cranstons is not supported by substantial evidence.

Nevertheless, the Cranstons urge us to find support for the trial court's findings and conclusions in the fact that the relationship between the parties was that of buyer and seller. The existence of a duty for constructive fraud may arise in one of two ways: by virtue of the existence of a fiduciary relationship, or, in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other. *Rice,* 670 N.E.2d at 1284. In a constructive fraud action based on misrepresentations between a buyer and a seller and not the existence of a fiduciary relationship, no presumption of fraud arises and the burden is on the plaintiff to prove all five elements of constructive fraud. *Strong,* 777 N.E.2d at 1147. A constructive fraud may arise in a buyer/seller relationship when: (1) a seller makes unqualified statements to induce another to make a purchase; (2) the buyer relies upon the statements; and (3) the seller has professed to the buyer that he has knowledge of the truth of those statements. *Stoll v. Grimm,* 681 N.E.2d 749, 757 (Ind.Ct.App. 1997).

Under the circumstances presented here, we decline the Cranstons' invitation to conclude that McNaughton owed them a duty and they had a right to rely on his representations merely because they were buyers in a transaction in which he was the seller. As a matter of course, every buyer/seller relationship likely involves a party who possesses at least some knowledge not possessed by the other, but that fact alone does not mean that one party enjoys a position of superiority over the other so as to create a special duty and a right of reliance. The Cranstons were

savvy real estate investors who agreed to a business deal with McNaughton that was supposed to, and did, earn them a profit over a period of years. McNaughton did not testify at trial and it is unclear what facts McNaughton may have possessed prior to entering into the transaction that, had those facts been disclosed, would have changed the Cranstons' decision to enter into the transaction. The Cranstons admittedly "did not investigate the transaction on their own" and "they did not even review the documents they were eventually asked to sign to complete the transaction." Appellees' Br. at 9. The Cranstons never saw and apparently knew nothing about the Inveraray property they agreed to purchase, and they appeared not to care. While the trial court found that McNaughton knew but failed to disclose to the Cranstons that Putnam's appraisal did not represent the true fair market value of the Inveraray property, the Cranstons neither looked at nor relied in their decision-making on the appraisal of the property, and they never questioned why First Federal declined to lend an amount equal to that purported value of the property. They knew that McNaughton planned to repurchase the property for $642,000 after the lease term, and thus the fair market value of the property for residential development purposes was of no moment to the Cranstons.[8]

Moreover, to the extent that the trial court found that McNaughton had a duty but failed to disclose to the Cranstons that the purpose of the Inveraray transaction was to conceal his previous violations of "Federal Banking Regulations," those findings are wholly without support. The trial court cites to no specific banking reg-

ulation that McNaughton violated. Moreover, there is no evidence that the Inveraray transaction itself violated any federal banking laws.

 We remind the Cranstons that constructive fraud is a theory of recovery founded in equity. While " '[t]he law is designed to protect the weak and credulous from the wiles and stratagems of the artful and cunning,' " it will not protect those who " 'stand mentally on equal footing and in no fiduciary relation,' " if they fail to exercise common sense and judgment. *Ehle v. Ehle,* 737 N.E.2d 429, 435 (Ind.Ct.App.2000) (quoting *Biberstine v. New York Blower Co.,* 625 N.E.2d 1308, 1316 (Ind.Ct.App.1993)). The Cranstons failed to exercise common sense and judgment in the instant case when they declined to conduct any investigation whatsoever as to the propriety of the Inveraray transaction. Under the circumstances, we will not find a special relationship of confidence between the parties so as to impose a duty and right of reliance. We reverse the trial court's judgment in favor of the Cranstons on their constructive fraud claim.

 Assuming arguendo that McNaughton owed a duty to the Cranstons to support their claim for constructive fraud, and assuming that duty was breached by McNaughton, the evidence presented does not support the trial court's conclusion that AHB may be held vicariously liable for McNaughton's constructive fraud. The trial court found, and the record is clear, that McNaughton had neither actual nor apparent authority to engage the Cranstons in the Inveraray transaction

---

**8.** We note that, although the Cranstons concede that they never saw the appraisal of the Inveraray property and did not rely on it to enter into the transaction, they attempt to piggyback a reliance argument on the fact that First Federal relied upon the over-valued appraisal to approve its loan to the Cranstons. This attempt is futile. The Cranstons cannot claim that they were deceived by an appraisal they never saw or even inquired about.

such as to impose liability on McNaughton's principal FNBF, now AHB. Nevertheless, the trial court concluded that FNBF ratified McNaughton's constructive fraud and, therefore AHB is estopped from asserting McNaughton's lack of authority to defeat the Cranstons' counterclaim for damages. Again, the trial court's conclusion is without evidentiary support.

Ratification is the adoption of that which was done for and in the name of another without authority. *Quality Foods, Inc. v. Holloway Assocs. Prof'l Eng'rs & Land Surveyors*, 852 N.E.2d 27, 33 (Ind. Ct.App.2006). Typically, ratification is a question of fact. *Beneficial Mtg. Co. of Indiana v. Powers*, 550 N.E.2d 793, 796 (Ind.Ct.App.1990), *trans. denied.* Ratification is based on the existence of three essential elements: (1) an unauthorized act performed by an individual for and on behalf of another and not on account of the actor himself; (2) knowledge of all material facts by the person to be charged with said unauthorized act; and (3) acceptance of the benefits of said unauthorized act by the person charged with the same. *Wilcox Mfg. Group, Inc. v. Mktg. Serv. of Indiana, Inc.*, 832 N.E.2d 559, 562–63 (Ind.Ct.App.2005).

The evidence presented at trial fails to support the first essential element of ratification, and thus the theory fails as a matter of law. The "unauthorized act" cited by the trial court was McNaughton's act of soliciting the Cranstons' participation in the Inveraray transaction and the resulting promissory notes. Schimmele's contact with the Cranstons was clearly on McNaughton's personal behalf, and neither Schimmele nor McNaughton purported to act on behalf of or in the interest of FNBF. The purchase/leaseback transaction was between the Cranstons and Inveraray, a company solely owned by McNaughton, and the transaction was intended to benefit only those parties. Accordingly, because the unauthorized act performed by McNaughton was performed on his own account and not on behalf of or in the interest of FNBF, FNBF cannot be said to have ratified McNaughton's alleged fraudulent behavior. The evidence presented does not support AHB's vicarious or imputed liability for McNaughton's conduct.[9]

The trial court erred when it denied AHB's complaint to collect on its promissory note and instead concluded that the Cranstons had proved their affirmative defense and counterclaim for constructive

---

9. In an argument very similar to their ratification argument, the Cranstons maintain that AHB should be estopped from denying liability to the Cranstons because FNBF aided and condoned McNaughton's conduct and therefore induced the Cranstons to believe that they could trust McNaughton. Again, the Cranstons ask that we impute liability to AHB for the individual acts of McNaughton and/or the other directors of FNBF. The Cranstons direct us to our supreme court's opinion in *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206 (Ind.2000), to support their argument that AHB may be held liable pursuant to the doctrine of inherent agency. The doctrine of inherent agency provides that an agent may derive his power to bind the principal wholly from his relation with the principal, e.g., as president or officer of the principal. *See id.* The doctrine requires that: (1) the agent acted within the usual and ordinary scope of his authority; (2) the other party reasonably believed that the agent was authorized to act for the principal; and (3) the other party had no notice that the agent was not authorized to act for the principal. *See id.* at 1212–13. As with the related doctrines of actual and apparent authority, the Cranstons reliance on this doctrine is misplaced. As we noted earlier, the record is clear that at no time did the Cranstons reasonably believe that McNaughton was acting on behalf of FNBF when he, through Schimmele, solicited their participation in the Inveraray transaction. That transaction was solely between the Cranstons and McNaughton and/or Inveraray.

fraud. Accordingly, we reverse the trial court's award of damages and attorney fees in favor of the Cranstons and remand to the trial court with instructions to enter judgment in favor of AHB and all other remedies consistent with this opinion.

Reversed and remanded.

BAKER, C.J., and DARDEN, J. concur.