**FOR PUBLICATION**



**FILED**

Mar 21 2014, 10:20 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**DANIEL A. EDELMAN**
**HEATHER KOLBUS**
Edelman, Combs, Latturner & Goodwin, L.L.C.
Chicago, Illinois

**MICHAEL P. MCILREE**
Hobart, Indiana

ATTORNEYS FOR APPELLEE:

**JENNIFER KALAS**
**SCOTT B. COCKRUM**
Hinshaw & Culbertson LLP
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| NATHAN WERTZ, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1305-CC-175 |
| | ) | |
| ASSET ACCEPTANCE, LLC, | ) | |
| | ) | |
| Appellee. | ) | |

**APPEAL FROM THE ST. JOSEPH SUPERIOR COURT**
The Honorable Jenny Pitts Manier, Judge
Cause No. 71D05-1208-CC-607

**March 21, 2014**

**OPINION – FOR PUBLICATION**

**NAJAM, Judge**

Nathan Wertz appeals the trial court's judgment dismissing his counterclaim against Asset Acceptance, LLC ("Asset") pursuant to Asset's Trial Rule 12(B)(6) motion.[2] Wertz raises six issues for our review, but we need only address the following dispositive issue: whether, under Indiana's Uniform Consumer Credit Code ("IUCCC"), Ind. Code §§ 24-4.5-1-101 to -7-414, Asset, an out-of-state business, was required to obtain an Indiana license to collect on a debt owed by Wertz that Asset had purchased from the original lending institution. We affirm.

## FACTS AND PROCEDURAL HISTORY

On August 9, 2012, Asset, a Delaware limited liability company with its principal place of business in Michigan, filed its complaint against Wertz. According to Asset's complaint, it had purchased a credit card account from "Chase Bank/First USA/Chase" ("Chase Bank") on which Wertz had defaulted.[3] Appellant's App. at 13. Asset sought to recover a principal balance of $6,594.26, together with interest, on that account.

On October 22, Wertz filed a counterclaim and putative class action against Asset. According to Wertz's counterclaim, Asset "has pursued litigation against over 400 persons in Marion County, Indiana[,] alone," and "'legal collections'" accounted for "44.9% of all [of Asset's] collections." Id. at 20-21. However, Wertz continued, Asset

---

[1] We held oral argument in this case on February 25, 2014.

[2] This appeal is from a final judgment entered pursuant to Trial Rule 54(B). See Ind. Appellate Rule 2(H)(2).

[3] At oral argument, counsel for Asset stated that Asset was not an assignee of the underlying debt but a purchaser of it. But, upon questioning, counsel clarified that, after Asset had purchased the underlying debt from Chase Bank, Chase Bank assigned the debt to Asset. For our purposes, we consider this sequence of events to be consistent with "[t]aking assignments" under Indiana Code Section 24-4.5-3-502(3)(b).

is not licensed under the IUCCC to take assignments of Indiana debts or to collect on those debts, and Asset does not otherwise meet the IUCCC's description of those entities authorized to "undertake direct collection of payments from debtors arising out of consumer loans." Id. at 19. As such, according to Wertz, Asset's collection efforts violated both the Indiana Deceptive Consumer Sales Act ("IDCSA"), I.C. §§ 24-5-0.5-0.1 to -12, and the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p. With his counterclaim, Wertz filed a motion to dismiss Asset's complaint on the ground that Asset lacked standing to obtain the relief it had requested.

On December 20, Asset filed a motion to dismiss the counterclaim pursuant to Indiana Trial Rule 12(B)(6). In particular, Asset argued that dismissal of the counterclaim was appropriate in that the IUCCC does not apply to it because it is not an Indiana business and it has no physical location within Indiana. Asset further asserted that Wertz's counterclaim failed to plead a claim under the IDCSA and the FDCPA. On March 18, 2013, the trial court granted Asset's motion to dismiss and denied Wertz's motion to dismiss. In relevant part, the court stated that "Wertz's counterclaims under the FDCPA and [IDCSA] are premised on the assumption that Asset needed to have been licensed either under the IUCCC or the [Indiana Collection Agency Act ("ICAA").] It did not . . . ." Id. at 12. Thereafter, the trial court entered judgment on Asset's motion to dismiss pursuant to Indiana Trial Rule 54(B).[4] This appeal ensued.

---

[4] Although Asset notes that this court is without jurisdiction to consider any arguments on appeal exclusive to Wertz's motion to dismiss, on which the trial court did not enter judgment pursuant to Trial Rule 54(B), Asset does not identify to what extent, if any, Wertz's arguments on appeal are improperly based only on his motion to dismiss.

**DISCUSSION AND DECISION**

Wertz asserts that the trial court erred when it granted Asset's Trial Rule 12(B)(6) motion to dismiss Wertz's counterclaim. In particular, Wertz contends that the IUCCC required Asset, an out-of-state business with no physical situs in Indiana, to obtain an Indiana license before it could take the assignment from Chase Bank or collect on Wertz's underlying debt. This is a question of first impression for Indiana's courts.

Our review of a trial court's grant of a motion to dismiss under Trial Rule 12(B)(6) is de novo and requires no deference to the trial court's decision. Sims v. Beamer, 757 N.E.2d 1021, 1024 (Ind. Ct. App. 2001). "A motion to dismiss under Rule 12(B)(6) tests the legal sufficiency of a complaint: that is, whether the allegations in the complaint establish any set of circumstances under which a plaintiff would be entitled to relief." Trail v. Boys & Girls Clubs of NW Ind., 845 N.E.2d 130, 134 (Ind. 2006). "Thus, while we do not test the sufficiency of the facts alleged with regards to their adequacy to provide recovery, we do test their sufficiency with regards to whether or not they have stated some factual scenario in which a legally actionable injury has occurred." Id. When reviewing a Trial Rule 12(B)(6) motion to dismiss, we accept the facts alleged in the complaint as true and view the pleadings in a light most favorable to the nonmoving party and with every reasonable inference in the nonmoving party's favor. Id. We view motions to dismiss under Trial Rule 12(B)(6) "with disfavor because such motions undermine the policy of deciding causes of action on their merits." McQueen v. Fayette Cnty. Sch. Corp., 711 N.E.2d 62, 65 (Ind. Ct. App. 1999), trans. denied.

This appeal also requires this court to interpret various statutes and consider an administrative agency's interpretation of those statutes. As we have explained:

4

Statutory interpretation is a question of law reserved for the court and is reviewed de novo. De novo review allows us to decide an issue without affording any deference to the trial court's decision. When a statute has not previously been construed, our interpretation is controlled by the express language of the statute and the rules of statutory construction. Our goal in statutory construction is to determine, give effect to, and implement the intent of the legislature. When a statute is subject to different interpretations, the interpretation of the statute by the administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless that interpretation is inconsistent with the statute itself. <u>When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency.</u> When a court determines that an administrative agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's interpretation. Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations.

<u>Ind. Dep't of Envtl. Mgmt. v. Boone Cnty. Res. Recovery Sys., Inc.</u>, 803 N.E.2d 267, 273 (Ind. Ct. App. 2004) (emphasis added; quotations, citation, omissions, alterations, and original emphases removed), <u>trans. denied</u>.

The licensing requirement of the IUCCC is stated in Indiana Code Section 24-4.5-3-502 ("Section 3-502"), which states:

(1) A person that is a:
    (a) depository institution;
    (b) subsidiary that is owned and controlled by a depository institution; or
    (c) credit union service organization;
may engage in the making of consumer loans that are not mortgage transactions without obtaining a license under this article.

(2) A collection agency licensed under IC 25-11-1[, the ICAA,[5]] may engage in:
    (a) taking assignments of consumer loans in Indiana; and

---

[5] A license under the ICAA is issued by the Secretary of State, <u>see</u> Ind. Code § 25-11-1-5(a), rather than the Department of Financial Institutions, which administers the IUCCC, <u>see</u> I.C. § 24-4.5-6-103.

(b) undertaking direct collection of payments from or enforcement of rights in Indiana against debtors arising from consumer loans;

without obtaining a license under this article.

(3) <u>A person that does not qualify under subsection (1) or (2) shall acquire and retain a license under this article in order to regularly engage in Indiana in the following actions with respect to consumer loans</u> that are not mortgage transactions:

(a) The making of consumer loans.
(b) <u>Taking assignments of consumer loans.</u>
(c) <u>Undertaking direct collection of payments from or enforcement of rights against debtors arising from consumer loans.</u>

(4) A separate license under this article is required for each legal entity that engages in Indiana in any activity described in subsection (3). However, a separate license under this article is not required for each branch of a legal entity licensed under this article to perform an activity described in subsection (3).

(Emphases added.)

There is no dispute that Asset does not meet the requirements of subsection (1). And although Wertz argues that subsection (2) could have applied to Asset,[6] there is no dispute that, regardless of whether Asset is a "collection agency" and regardless of whether it could have obtained a license under the ICAA, Asset did not obtain that license and, therefore, it is not a "collection agency licensed under [the ICAA]." <u>See</u> I.C. § 24-4.5-3-502(2). Thus, Asset's taking of the assignment and attempt to collect on the debt cannot qualify under either the ICAA or Section 3-502(2).

Accordingly, the question on appeal is whether Asset, a Delaware limited liability company with its principal place of business in Michigan, "regularly engage[s] in Indiana" in taking assignments of consumer loans or in the collection of payments from

---

[6] In particular, throughout his brief Wertz provides various formulations of the statement that "the fact that Asset does not need to have a loan license [under subsection (3)] does not mean that it does not need any license at all under § 3-502." Appellant's Br. at 24 (emphasis removed). Moreover, while these statements might come across as a concession that Asset need not hold a license under subsection (3), it is clear from the balance of his arguments that Wertz is not conceding this point.

debtors arising from consumer loans.[7]  See I.C. § 24-4.5-3-502(3).  The parties agree that the phrase "regularly engage in Indiana" is ambiguous and is not defined in the IUCCC. Accordingly, to aid in our interpretation we turn to the underlying policies of the IUCCC as well as the relevant administrative agency's interpretation of the IUCCC.  See id.

Indiana Code Section 24-4.5-1-102 describes the underlying purposes and policies of the IUCCC and states, in relevant part, as follows:

> (1) This article shall be liberally construed and applied to promote its underlying purposes and policies.
>
> (2) The underlying purposes and policies of this article are:
> (a) to simplify, clarify, and modernize the law governing retail installment sales, consumer credit, small loans, and usury;
> (b) to provide rate ceilings to assure an adequate supply of credit to consumers;
> (c) to further consumer understanding of the terms of credit transactions and to foster competition among suppliers of consumer credit so that consumers may obtain credit at reasonable cost;
> (d) to protect consumer buyers, lessees, and borrowers against unfair practices by some suppliers of consumer credit, having due regard for the interests of legitimate and scrupulous creditors;
> (e) to permit and encourage the development of fair and economically sound consumer credit practices;
> (f) to conform the regulation of consumer credit transactions to the policies of the Federal Consumer Credit Protection Act and to applicable state and federal laws, rules, regulations, policies, and guidance; and
> (g) to make uniform the law, including administrative rules among the various jurisdictions.
>
> (3) A reference to a requirement imposed by this article includes reference to a related rule or guidance of the department adopted pursuant to this article. . . .

A "[c]reditor" under the IUCCC is

> a person:

---

[7]  There is no dispute that Asset does not regularly engage in the making of consumer loans pursuant to Section 3-502(3)(a).

(a) who regularly engages in the extension of consumer credit that is subject to a credit service charge or loan finance charge, as applicable, or is payable by written agreement in more than four (4) installments (not including a down payment); and

(b) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is not a note or contract.

I.C. § 24-4.5-1-301.5(11). And, as noted above, the Indiana Department of Financial Institutions ("DFI") is the "department" that has been charged with administration of the IUCCC. See I.C. § 24-4.5-6-103.

Indiana Code Section 24-4.5-1-201(1) states the jurisdictional reach of the IUCCC. In relevant part, that statute provides that "this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made." I.C. § 24-4.5-1-201(1).[8] In 2007, our legislature amended the statute to add subsection (d), which has been subsequently amended[9] and currently reads as follows:

a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

---

[8] In his brief, Wertz states that Indiana has extended the territorial reach of the IUCCC to allow for "actions or other proceedings brought in this state to enforce rights arising from . . . consumer loans, . . . wherever made." Appellant's Br. at 17 (quoting I.C. § 24-4.5-1-201(2)) (emphasis removed; omissions original). But this quote is misleading because it omits language from subsection (2). Contrary to Wertz's representation, subsection (2) states that certain remedies and penalties provided in Chapter 5 of the IUCCC apply to actions brought in this state regardless of where the underlying contract was made. I.C. § 24-4.5-1-201(2). As such, subsection (2) is inapposite to this appeal.

[9] The post-2007 amendments are not relevant to this appeal.

8

I.C. § 24-4.5-1-201(1)(d). In other words, a loan transaction "occurs in Indiana" if an out-of-state creditor or its agent in any way advertises or solicits business in Indiana and enters into the transaction with a resident of Indiana.

The DFI has issued publications interpreting the IUCCC. In particular, according to a publication effective July 1, 2012, the DFI has announced certain "loan license requirements" to explain when a license is required under Section 3-502. Appellant's App. at 232. As relevant here, that publication states:

> For non-mortgage consumer loans, a loan license is required if a lender is regularly engaged in making consumer loans, and regularly engaged for non-mortgage credit is more than twenty-five consumer loans in a year.
>
> * * *
>
> A loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a loan transaction with a creditor who is based in Indiana, or if the creditor is in another state and the creditor has advertised or solicited loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means (See IC 24-4.5-1-201(d)). Assignees need a loan license if they are based in Indiana and take assignment or undertake direct collection of consumer loans that were made in Indiana (See IC 24-4.5-3-502 and 6-102).

Id. (emphasis added).[10] That publication is consistent with past publications of the DFI. See, e.g., id. at 233.

In sum, the IUCCC exists, in part, to protect consumers from unfair collection practices by requiring certain creditors and other entities to obtain a license before they may collect debts. I.C. § 24-4.5-1-102(2). The IUCCC also demonstrates our

---

[10] In rejecting a similar claim to Wertz's, the United States District Court for the Northern District of Indiana cited additional documents from the DFI that likewise require out-of-state companies to have an Indiana location before those companies need to obtain a license under the IUCCC. See Sheetz v. PYOD LLC, No. 3:12-CV-811-JD-CAN, 2013 WL 5436943, at *6-*7 (N.D. Ind. Sept. 26, 2013). However, those documents are not in the record in this appeal.

legislature's intent to reach all potential creditors that demonstrate sufficient minimum contacts with Indiana. I.C. § 24-4.5-1-201. However, for entities that are not depository institutions, subsidiaries of depository institutions, credit unions, or collection agencies licensed under the ICAA, the IUCCC expressly requires licensure only if those entities "regularly engage in Indiana" in either the making of consumer loans, taking assignments of consumer loans, or undertaking direct collection of payments from or enforcement of rights against debtors arising from consumer loans. I.C. § 24-4.5-3-502(3). And the IUCCC expressly incorporates the "guidance" of the DFI as consistent with the IUCCC's underlying policies. See I.C. § 24-4.5-1-102(3). The DFI, in turn, has interpreted Section 3-502(3) to apply to the assignee of a nonmortgage consumer loan only when that entity has a physical situs within Indiana.

With this statutory framework in mind, we turn to Wertz's arguments on appeal. First, Wertz asserts that the DFI's publications and the rationale underlying those publications are contrary to the legislative intent and policies underlying the IUCCC. Second, Wertz argues that the DFI's publications were not promulgated pursuant to the Indiana Administrative Rules and Procedures Act and are, therefore, invalid. We address each argument in turn.[11]

Regarding the argument that the DFI's publications are contrary to our legislature's intent, Wertz asserts that our legislature intended for the IUCCC to reach all

---

[11] Wertz also asserts that the DFI publications are irrelevant because "most out[-]of[-]state debt buyers complied with § 3-502 by getting a collection agency license" under the ICAA, Appellant's Br. at 14, and that the DFI publications "erroneously focus[] on whether Asset needed an IUCCC loan license, not a collection agency license" under the ICAA, id. at 16 (emphasis removed). But as discussed above there is no dispute that Asset is not a collection agency licensed under the ICAA. Accordingly, these arguments are without merit.

10

entities with sufficient minimum contacts with Indiana and that this reach extends to the IUCCC's licensure requirements.[12] In support, Wertz asserts that the DFI has mistakenly relied on comments to the 1968 Uniform Consumer Credit Code instead of relying on the plain language of the IUCCC as amended in 2007. We cannot agree.

The Indiana Supreme Court has squarely rejected Wertz's assertion that the commentary to a uniform act "represents what Indiana rejected, not what it enacted." See Appellant's Br. at 20. In particular, in Basileh v. Alghusain, 912 N.E.2d 814, 821 (Ind. 2009), our Supreme Court held that "[t]he comments to a uniform act are indicative of the Legislature's intent in enacting a statute based on the uniform act." Wertz makes no attempt to discuss or distinguish this clear guidance from our Supreme Court. Instead, for support of his assertion he cites Ira Holtzman, C.P.A. v. Turza, 728 F.3d 682, 688 (7th Cir. 2013), cert. denied, 82 U.S.L.W. 3409 (Feb. 24, 2014). But at no point in that opinion does the United States Court of Appeals for the Seventh Circuit discuss Indiana law. Instead, the court's entire analysis is based on regulations of the Federal Communications Commission and case law of the Supreme Court of the United States. Wertz's assertion that the comments to the Uniform Consumer Credit Code are not indicative of our legislature's intent in enacting the IUCCC is without merit.

The United States District Court for the Northern District of Indiana has also rejected an argument identical to Wertz's in Scheetz v. PYOD LLC, No. 3:12-CV-811-JD-CAN, 2013 WL 5436943 (N.D. Ind. Sept. 26, 2013), and Havens v. Portfolio

---

[12] Wertz also relies on Indiana Code Section 24-4.5-6-201(1) as support for his position that the IUCCC applies broadly to entities outside of Indiana. But Wertz's attempt to connect the language of that statute to his argument lacks cogency.

11

Investment Exchange, Inc., ___ F. Supp. 2d ___, 2013 WL 6086158 (N.D. Ind. Aug. 15, 2013).[13]  Specifically, the Scheetz court stated as follows:

> Section 3-502 is a part of the IUCCC, which was enacted in Indiana based on the Uniform Consumer Credit Code, as promulgated in 1968.  Indiana section 3-502 corresponds to section 3-502 of the 1968 Uniform Code.  The commentary to Uniform Code section 3-502 states, in part:  "Out-of-state lenders who make loans through the mail normally will not be subject to the licensing requirement if the evidence of debt is received by the lender out of this State.  An out-of-state lender who opens a loan office in this State at which evidence of debt for [consumer] loans is received must be licensed."  Unif. Consumer Credit Code (1968) § 3-502 cmt. 2 (citation omitted).

> Other sections of the IUCCC contain similar commentary which bars the application of the statute to out-of-state businesses.  For example, section 6-201 of the IUCCC relates to the requirement that certain businesses file a notification with the DFI before engaging in certain activities in Indiana.  One such regulated activity is "[t]aking assignments of rights against debtors that arise from sales, leases, or loans by a person having an office or a place of business in Indiana."  Ind. Code § 24-4.5-6-201(1)(b).  The commentary to that section in the Uniform Code states, in part:  "Assignees of consumer obligations must file notification under Section 6.202 only if all of the three following elements are present:  (1) the assigned obligations arose out of sales, leases or loans made in this State, (2) the assignee has an office or place of business in this State, and (3) the assignee undertakes direct collection of payments from the debtors or direct enforcement of obligations against debtors.  An assignee having no office

---

[13]  Although Sheetz is unpublished, that does not foreclose this court's consideration of it.  While not-for-publication memorandum decisions of the Indiana Court of Appeals "shall not be regarded as precedent and shall not be cited to any court" absent certain exceptions, App. R. 65(D), that is not true in the federal court system, see Fed. R. App. P. 32.1; see also id. cmt. ("a court of appeals may not prohibit a party from citing an unpublished opinion of a federal court for its persuasive value . . . .").  Indiana Appellate Rule 65(D) applies only to not-for-publication memorandum decisions of the Indiana Court of Appeals.  See App. R. 65(D).

We also note that counsel for Wertz was the counsel of record in the Sheetz and Havens decisions as well as in a third decision of the district court, Niemiec v. NCO Financial Systems, Inc., No. 1:05-CV-219, 2006 WL 1763643 (N.D. Ind. June 27, 2006).  Yet, despite his knowledge of the Sheetz decision, that decision's clear relevance to the instant appeal, and Asset's unambiguous reference to and reliance on that decision in its brief, Wertz's counsel neither cites nor discusses the Sheetz decision in either of his briefs on appeal.  Further, Wertz's counsel's only mention of the Havens decision is to say that the Havens court "improperly relied on the 1968 Commentary to the Uniform Consumer Credit Code in reaching its conclusion."  Appellant's Br. at 20.  As explained in the text of our discussion, we reject this apparent attempt to distinguish persuasive federal authority.  And while the Niemiec decision is relevant to Wertz's FDCPA claims, which we need not reach here, as he did with the Sheetz decision Wertz's counsel wholly ignores the Niemiec decision.

or place of business within this State is not required to file notification even though he is engaged in direct collection or direct enforcement of consumer accounts in this State." Unif. Consumer Credit Code (1968) § 6-201 cmt. 2.

The commentary seems to indicate a legislative intent not to apply the IUCCC to companies physically located outside of Indiana. However, M[s]. Scheetz raises two arguments against the application of the commentary in this case. First, she argues that the commentary is a comment to the Uniform Consumer Credit Code and not the actual commentary of the Indiana legislature. Second, she argues that the statute has been subsequently amended and the current version "makes no reference to an exemption for debt buyers or lenders."

Her first argument is foreclosed by the fact that Indiana courts do consider the commentary to the Uniform Code as indicative of the intent of the Indiana legislature in enacting the Uniform Code. Basileh, 912 N.E.2d at 821.

With respect to her second argument, Ms. Scheetz is correct that section 3-502 has been amended several times since its original enactment. The majority of those amendments do not speak to the extraterritorial application of its licensing provisions. See Ind. Pub. L. 122-1994 § 24 (amending statute to be gender neutral); Ind. Pub. L. 10-2006 § 6, 57-2006 § 6 (amending statute to engage in cosmetic rewriting). However, one amendment seems to signify an intent to limit application of the statute as to out-of-state entities. Specifically, in 2000, the legislature changed the licensing requirements from applying to any entity that "engage[d] in this state in the business of" the listed activities, to applying the licensing requirements to any entity that "regularly engage[d] in this state" in those activities. Ind. Pub. L. 23-2000 § 7 (emphasis added). The fact that the legislature increased the required nexus to the state—requiring more contact with Indiana before a license is required—evidences a legislative intent consistent with the opinions expressed in the Uniform Code commentary (rather than inconsistent with that commentary, as Ms. Scheetz argues).

Accordingly, the Court predicts that the Indiana Supreme Court would consider as persuasive the Uniform Code commentary expressing that section 3-502 did not intend to require an out-of-state company to obtain a license under the IUCCC.

13

Sheetz, 2013 WL 5436943 at *5-*6 (emphases added; footnote and citations to the record omitted; alterations original); see also Havens, 2013 WL 6086158 at *2-*4 (reaching the same conclusions).

We agree with the district court's rejection of the argument that the plain language of the IUCCC extends the licensure requirement to entities not physically located within Indiana. In addition to the reasons stated by the district court, we add that Wertz's reliance on the 2007 amendment to Indiana Code Section 24-4.5-1-201(1) is misplaced because the jurisdictional reach described in subsection (d) of that statute applies to all "creditor[s]" that have sufficient minimum contacts in Indiana. But Section 3-502(3), which is the licensure requirement relevant here, does not require "creditors" to obtain a license and instead focuses on the actions undertaken by the entity in question. These actions, in particular that of taking an assignment or collecting on a debt, may or may not be the actions of a creditor.

Further, while a creditor is an entity that "regularly engages" in certain practices, I.C. § 24-4.5-1-301.5(11), that definition differs from the phrase "regularly engage in Indiana" that is found in Section 3-502. The inclusion of the prepositional phrase and geographical limitation "in Indiana" demonstrates that our legislature sought to connect this provision of the IUCCC's licensure requirement to those entities located "in Indiana." That is, given that the entities described in Section 3-502(3) may be more remotely connected to Indiana than a creditor, our legislature added this phrase to Section 3-502(3) to ensure that those entities would have a physical presence in our jurisdiction. While other interpretations of this phrase may be reasonable, this interpretation is also

14

reasonable. As this is the interpretation of the DFI, we must accept it. See Boone Cnty.

Res. Recovery Sys., Inc., 803 N.E.2d at 273.

We also note that, at oral argument, counsel for Wertz asserted that Section 3-502(3) does not apply here because, according to the DFI publication, Asset needed to have made twenty-five or fewer consumer loans per year to avoid "regularly engag[ing] in Indiana." See Appellant's App. at 232. According to Wertz, Asset far exceeded this number, as demonstrated by the more-than-400 complaints Asset is alleged to have filed in Marion County alone.

This argument misunderstands the DFI publication. Section 3-502(3) describes three actions that may subject an entity to licensure: the making of consumer loans, the taking assignments of consumer loans, or the collection of payments from debtors arising from consumer loans. I.C. § 24-4.5-3-502(3). The DFI publication tracks that structure, and the language of the DFI publication that Wertz relies on here states: "a loan license is required if a lender is regularly engaged in making consumer loans, and regularly engaged for non-mortgage credit is more than twenty-five consumer loans in a year." Appellant's App. at 232. On its face that language applies only to entities that make consumer loans. Asset is not such an entity, and the volume of its collection attempts is insignificant because Asset is not engaged in making consumer loans.

Finally, we turn to Wertz's argument that the DFI publication is invalid because it was not properly promulgated through a formal rulemaking process. The Sheetz court also considered and rejected this argument, stating as follows:

> The IUCCC grants the DFI broad powers of enforcement, interpretation, and oversight with respect to the IUCCC. For example, the definitional section of the IUCCC states: "A reference to a requirement imposed by

15

this article includes reference to a related rule or guidance of the [DFI] adopted pursuant to this article." Ind. Code § 24-4.5-1-102(3). Further, the IUCCC grants the DFI the power to "counsel persons and groups on their rights and duties" under the IUCCC, "adopt, amend, and repeal rules, orders, policies, and forms to carry out the provisions of this article," and exempts from liability any act taken in conformity with a rule, written opinion, or written interpretation of the DFI. Ind. Code § 24-4.5-6-104(1)(b), (1)(e), (2).

* * *

The DFI interpretations evidence a consistent agency interpretation that a physical presence in Indiana is required before an IUCCC license must be obtained. . . .

* * *

Finally, [Sheetz] argues that the interpretations should be afforded no deference by this Court because the interpretations were not issued through a formal rulemaking process. First, Indiana courts do not require an agency interpretation to be promulgated as a formal agency rule before granting it deference. See Ind. Ass'n of Beverage Retailers, Inc. v. Ind. Alcohol and Tobacco Comm'n, 945 N.E.2d 187, [198] (Ind. Ct. App. 2011)[, trans. denied]. Further, the Court notes that the DFI's authority under the IUCCC is broad and not limited to official rulemaking under the Indiana Administrative Agency Act. Specifically, the IUCCC allows the DFI to "counsel persons and groups on their rights and duties" under the IUCCC and exempts from liability those who act in conformity with that guidance. Ind. Code § 24-4.5-6-104(1)(b), (2). The very act of providing individual guidance is incompatible with a formal, universally applicable rulemaking process. This shows that the legislature's intent could not have been to require all such interpretation to flow through the formal requirements of the Indiana Administrative Agency Act.

Accordingly, the Court predicts that the Indiana Supreme Court would afford great deference to the DFI's interpretation that the IUCCC is not intended to require a license for an out-of-state company with no physical location in Indiana . . . .

Sheetz, 2013 WL 5436943 at *6-*8 (first alteration original). We agree with the district court's analysis on this issue.

16

In conclusion, we hold that Section 3-502(3) applies to an out-of-state business with its principal place of business in another state only if that business has a physical location within Indiana. The DFI's interpretation of Section 3-502(3) is consistent with the legislative intent of the IUCCC and is a reasonable interpretation of the phrase "regularly engage in Indiana." We must defer to the DFI's reasonable interpretations of the IUCCC's provisions as it is the agency charged with administration of the IUCCC. We also hold that the DFI was not required to engage in formal rulemaking for its policies and interpretations to have any force or effect.[14]

Accordingly, because Asset is a Delaware limited liability company with its principal place of business in Michigan, and because Asset does not have a physical situs within Indiana, the IUCCC's licensure provision does not apply to it. Because Asset was not required to obtain a license under the IUCCC, Wertz's claims under the IDCSA and the FDCPA cannot stand as alleged. Thus, we affirm the trial court's dismissal of Wertz's counterclaim for failure to state a claim upon which relief can be granted.

Affirmed.

BAKER, J., and CRONE, J., concur.

---

[14] Given our holdings, we need not consider Asset's various alternative arguments for affirming the trial court's judgment, including Asset's argument that Wertz's interpretation of the IUCCC is contrary to the Commerce Clause.