

**FILED**

Oct 26 2018, 8:53 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan H. Babb
V. Samuel Laurin
Christopher S. Roberge
Elizabeth A. Roberge
BOSE MCKINNEY & EVANS LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Andrew W. Hull
Jason L. Fulk
HOOVER HULL TURNER LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| BloomBank, | October 26, 2018 |
| *Appellant-Plaintiff,* | Court of Appeals Case No. 18A-PL-375 |
| v. | Appeal from the Marion Superior Court |
| United Fidelity Bank F.S.B., et al., | The Honorable Heather A. Welch, Judge |
| *Appellees-Defendants.* | Trial Court Cause No. 49D01-1606-PL-19471 |

**Bailey, Judge.**

# Case Summary

BloomBank, f/k/a Bloomfield State Bank, ("BloomBank"), a participant lender to a real estate developer, sued United Fidelity Bank F.S.B. ("UFB"), the primary lender, and Village Capital Corporation ("Village Capital"), a successive developer and affiliate of UFB, for allegedly fraudulently inducing BloomBank to sell its interest to UFB at a lower-than-market price, breaching the terms of the parties' contract, and gaining unjust enrichment. BloomBank now appeals the trial court's "Order Granting Defendants' Motion to Dismiss [BloomBank's] Third Amended Complaint."

We affirm in part, reverse in part, and remand.

# Issues

BloomBank raises the following four issues:

> I. Whether BloomBank sufficiently pled a claim for constructive fraud.
>
> II. Whether BloomBank sufficiently pled a claim for actual fraud.
>
> III. Whether BloomBank sufficiently pled a claim for breach of contract.
>
> IV. Whether BloomBank sufficiently pled a claim for unjust enrichment.

# Facts and Procedural History

[4] The relevant facts, as alleged in BloomBank's Third Amended Complaint and attached exhibits, are as follows.[1]

[5] On May 23, 2007, UFB agreed to loan $7.7 million ("the Loan"), secured by a mortgage on a residential development in Hamilton County called Anderson Hall ("the Property"), to Estridge Development Company, Inc. ("Estridge"). BloomBank and two other banks (collectively forming TriCapital, LLC and collectively referred to as "TriCapital participants"), agreed to provide approximately $3.275 million of the loan amount to UFB in exchange for a 42.5287% interest in the profits and losses associated with the Loan ("the Participatory Interest"). BloomBank held a 40% interest in the TriCapital participation, for which BloomBank paid $1,309,883.96. The TriCapital participants and UFB memorialized their transaction in a Participation Agreement, executed on May 23, 2007.

[6] The Participation Agreement (alternately referred to as the "contract") between UFB and the TriCapital participants provided, in relevant part:

---

[1] We review a dismissal under Rule 12(B)(6) de novo and accept as true the facts alleged in the complaint. *Birge v. Town of Linden*, 57 N.E.3d 839, 843 (Ind. Ct. App. 2016).

ARTICLE IV

ADMINISTRATION OF THE LOAN

4.1     All Loan Documents shall be executed by the Borrower [Estridge] in favor of the Lender [UFB] and shall be held by the Lender as trustee for the Participant [TriCapital participants] to the extent of its Participatory Interest in the Loan.  The Lender reserves the right, in its sole and absolute discretion, in such instance upon prior verbal notice, to be subsequently confirmed by written notice to the Participant, to enforce any and all of the obligations and liabilities of Borrower under the Loan or any of the Loan Documents … The Lender agrees that[,] without the prior written consent of the Participant, which consent shall not be unreasonably withheld or delayed, the Lender shall not … (d) realize on any collateral which may secure the Loan …

* * *

4.2     The Lender shall service the Loan in accordance with its usual and customary practice in the ordinary course of its business and will exercise care in the administration of the Loan as if it were an average prudent lender having made the entire Loan by itself.  It is expressly understood and agreed that the Lender does not assume nor shall it be deemed to have any responsibility or liability to the Participant, either express or implied, for:

* * *

(b)     with Participant's written consent, notice of which shall be promptly given, for any failure to realize upon any collateral for the Loan …

* * *

The Participant expressly consents, acknowledges and agrees that the Lender shall have no liability to Participant for any actions the Lender takes in accordance with this Agreement with Participant's prior consent.

4.3 … The Lender shall promptly notify the Participant of events of which it has actual knowledge and which might materially adversely affect its interest …

* * *

ARTICLE X

MISCELLANEOUS PROVISIONS

* * *

10.12 The headings of the Articles in this Agreement are inserted solely for convenience of reference, and are not intended to govern, limit, or aid in the construction of any term or provision hereof.

* * *

Appellant's App. Vol. III, pp. 186-87, 193.[2]

---

[2] BloomBank also points to Article VIII, § 8.1(b), but does not pursue a claim on appeal that UFB violated that provision. Perhaps that is because the body of that section expressly states that it relates to "matters

[7] Because UFB was the lead lender and mortgagee, the TriCapital participants had no privity of contract with Estridge, no disclosed interest in the Loan, and no interest of public record in the Property. The TriCapital participants relied on UFB to provide them with timely and accurate information regarding the status of the Loan and the collateral securing repayment of the Loan, as contemplated in the Participation Agreement.

[8] Estridge ultimately defaulted on the loan. On February 17, 2012, UFB filed a foreclosure action against Estridge. The participant lenders were required to contribute their pro rata share of all attorney's fees, costs, and expenses incurred by UFB in enforcing the terms of the Loan documents and in realizing on the collateral pledged as security for repayment of the Loan. On May 15, 2013, a final judgment in the foreclosure case was entered in favor of UFB in the amount of $6,826,240.93.

[9] On June 4, 2013, UFB filed a praecipe for a sheriff's sale of the Property that was collateral for the Loan. On June 14, 2013, a competing lien holder in the foreclosure action, Marilyn Anderson ("Anderson"), filed a notice of appeal. Anderson did not post a bond or seek a stay of the sheriff's sale. During this same time period, UFB and the TriCapital participants were engaged in negotiations regarding UFB's possible repurchase of the participant lenders' interest in the Loan. On July 9, 2013, UFB offered to repurchase the TriCapital

concerning the Borrower and the Loan…" *id.* at 191, and the Borrower and the Loan itself are not at issue in this case; it is only the sale of the collateral, after default on the Loan, that is at issue.

Participatory Interest for a total purchase price of $1,150,000.00, i.e., less than one-third of the original purchase price paid to UFB by the Tri-Capital participants for the Participatory Interest.

[10] On July 31, 2013, Pat Pfeifer ("Pfeifer"), a representative of the TriCapital participants, wrote to Donald R. Neel ("Neel"), the President and Chief Executive Officer of UFB and Village Capital, a corporation located in Evansville and an affiliate of UFB. Pfeifer wrote the following regarding the TriCapital participants' potential losses associated with acceptance of the UFB proposal to buy the Participatory Interest:

> We had two areas of concern we would like to address:
>
> 1. Written disclosure of any negotiations to sell the note/collateral prior to sheriff sale[.]
>
> 2. Bid price – UFB has not disclosed what its bid offer [is] to Tri-Capital; however, [i]f a bidder shows up and offers $2.8MM or greater[,] we would be better off letting it sell to that bidder than taking the offer of $1,150,00. If you can please elaborate on your bid price and why.

Appellant's App. Vol. III at 247.

[11] On August 1, 2013, there was a sheriff's sale of the Property. UFB was the successful bidder for the Property in exchange for a judgment bid in the amount of $2,800,000.00, a sum millions of dollars lower than the Property's actual value. That afternoon, Neel responded to Pfeifer's inquiry in an email that stated, in relevant part:

> We are able to represent that we had not entered into any negotiations to sell the note/collateral prior to the sheriff's sale. We have received calls and inquiries requesting information about parts of the property (developed lots), but[,] based on the cloud of the Anderson situation[,] have not attempted to negotiate a sale. Your second item … is now moot given the results of the auction today….

*Id*. at 246-47.

[12] The following morning, August 2, Pfeifer sent Neel an email that stated in relevant part:

> We are seeking full disclosure of any offers, calls and inquiries. The purpose of which is [to] provide satisfaction that a discounted sale of the participation is done with full knowledge of any and all offers which may have caused the participants to reconsider the acceptance of a discount.
>
> * * *
>
> Lastly[,] I will put it this way, if the property were sold to a party for a price that would result in a smaller loss to the participant group and that conversation had begun prior to or during our acceptance of this discounted offer[,] then we would take issue that [sic] we had not been informed about it.
>
> * * *

*Id*. at 246.

[13] That afternoon, August 2, Neel responded to Pfeifer's inquiry in an email that stated, in relevant part:

I will note below the parties (that we have record of) that have contacted UFB regarding [the Property], and the related litigation. … Only recently did our proposal advance with your group, and a price (that we believe is fair given the ongoing risk) was reached.

1.     Due to the pending Anderson appeal, we are not now in a position to sell the entire property as we only have clear title on the eastern portion of the property.  Resolution of the Anderson litigation[,] based on what we anticipate the Anderson's strategy to be[,] could take several years.

2.     By offering a fair price to the participants, UFB is providing an exit strategy for the participants while it takes over the remaining risk of the Anderson appeal and the risks of developing the balance of the lots.

* * *

4.     Interest and contacts regarding the property have involved the potential sale of individual or small groups of developed lots to builders….

* * *

Builders that have made inquiries (to confirm, NO OFFERS TO PURCHASE HAVE BEEN RECEIVED) as the pending Anderson appeal has created issues for the title company (I would note that all of the following builders are assuming[,] since we have now been successful at the sheriff's sale[,] that we have clear marketable title which as to the west half of the property is not the case. …):

1.     Weekley Homes

2.  Gradison Homes

3.  Fischer Homes …

4.  Drees Homes – bidder at sheriff's sale

5.  Estridge

6.  M/I

*Id*. at 245-46 (emphasis in original).

[14] On August 19, 2013, the TriCapital participants and UFB executed a Loan Participation Purchase and Assumption Agreement ("Purchase Agreement"), pursuant to which the TriCapital participants sold their Participatory Interest to UFB for $1,240,000, of which BloomBank was entitled to 40% ($496,000). The August 1 and 2 emails, above, were attached to and incorporated by reference into the Purchase Agreement. The Purchase Agreement stated, in relevant part:

\* \* \*

1.  Agreement to Purchase and Sell. … Seller [TriCapital participants] hereby agrees to sell, assign, transfer and convey to Buyer [UFB] on or before August 21, 2013, (the "Closing Date"), … the Participatory Interest….

\* \* \*

3.3. No Recourse. Buyer is purchasing the Participatory Interest on an "as-is, where-is" basis, and without recourse.

Seller and Buyer have had the opportunity to engage legal counsel and have performed such due diligence that they deem necessary and appropriate in connection with the purchase and assignment contemplated hereunder.

* * *

3.4.    Termination of Participation Agreement.  The Closing of this transaction and execution and delivery of the Assignment attached hereto as Exhibit C shall constitute a termination of the Participation Agreement.

* * *

5.5.    Buyer's Representations Relating to Purchase Offer Negotiations and Settlement.  Buyer represents to Seller, and Seller, in entering into this Agreement, is relying on this representation, that, except as disclosed in the e-mail of Don Neel dated August 2, 2013, which is attached hereto as Schedule D, that as of the Effective Date [August 19, 2013], Buyer has not (a) engaged in any negotiations with, or entered into any agreement with, any person … with regard to the sale or other transfer … of the real estate secured by the Loan …

* * *

7.2.    Release by Seller.  In consideration of the execution of this Agreement and the mutual promises contained herein, Seller … hereby irrevocably and unconditionally covenants not to sue and releases and forever discharges Buyer … of and from any and all actions … of any nature whatsoever … from the beginning of time to the date of this Agreement … arising from, resulting from, arising out of, caused by and/or related to the Loan, the Participation Agreement, or related to the facts, origination,

servicing, or circumstances of the Loan, Participation Agreement, or the Participatory Interest. This Release shall not release Buyer from its obligations under this Agreement and for the breach of any representations contained in this Agreement.

\* \* \*

*Id*. at 235-36, 238-39.

[15] On September 25, 2013—approximately thirty-seven days after the Effective Date of the Purchase Agreement—UFB settled the Anderson appeal. On December 2, 2013, that appeal was dismissed on the joint motion of the parties. The following day, UFB transferred title to the Property to its affiliate, Village Capital, by way of a quitclaim deed executed by Neel. Commencing in December 2013, Village Capital began selling lots within the Property to companies owned by and/or affiliated with Estridge and the Pedcor Companies ("PedCor"). Village Capital had received gross proceeds for such sales of approximately $9,513,540.00 as of August 31, 2016.

[16] After selling its Participatory Interest to UFB, BloomBank discovered that UFB had actively discouraged one or more third parties from submitting bona fide bids at the sheriff's sale in excess of the judgment bid submitted by UFB. UFB was aware that certain third parties were interested in acquiring the Property at the sheriff's sale and were willing to place bids in excess of UFB's judgment bid in order to purchase the Property. Instead of encouraging bids from such third parties, however, UFB purposefully discouraged such bids to secure UFB's position as purchaser of the Property at the lowest possible price.

BloomBank's complaint alleges the following as an example. A representative of Drees Homes ("Drees") was present at the sheriff's sale, and actively bid for the Property. A representative of UFB discouraged Drees from continuing to bid, however, based upon UFB's stated intention to outbid Drees regardless of amount. A third party bid in excess of UFB's judgment bid would have yielded a higher recovery for the participant lenders, but UFB chose to act in direct derogation of the derivative rights of the participant lenders in the collateral securing repayment of the Loan.

After selling its Participatory Interest, BloomBank also discovered that, following the sheriff's sale, and prior to the execution of the Purchase Agreement, UFB refused to entertain offers from one or more third parties interested in purchasing the Property from UFB. For example, on August 13, 2013—almost two weeks after the sheriff's sale and approximately six days before the execution of the Purchase Agreement—Joseph L. Gradison of Gradison Design-Build ("Gradison") met with Bruce A. Cordingly of Pedcor and stated that he was interested in purchasing the Property. Pedcor is a large group of companies engaged in real estate investment, development, marketing, management, and finance. Pedcor Financial Bancorp is the ultimate parent of UFB. Mr. Cordingly refused to entertain any offer from Gradison, however, informing Gradison that the Property was not for sale. UFB failed to disclose to the TriCapital participants that the only reason UFB had not engaged in any negotiations regarding the sale or transfer of the Property was the fact that UFB refused to do so.

On May 26, 2016, BloomBank filed a Complaint for Damages against UFB and Village Capital[3]. BloomBank subsequently filed two amended complaints. UFB moved to dismiss the Second Amended Complaint for failure to state a claim, and the trial court granted that motion on August 21, 2017. On August 31, BloomBank filed its Third Amended Complaint. In addition to the facts as stated above, the Third Amended Complaint made the following allegations:

> 66. The refusal to entertain third party offers to purchase the Property following the Sheriff's sale was in direct derogation of the participant lenders' derivative rights in the collateral securing repayment of the Loan.
>
> 67. UFB never disclosed to the participant lenders that UFB had discouraged bidding at the Sheriff's sale and also refused to entertain third party offers to purchase the Property, despite UFB's contractual obligation to secure the participant lenders' prior consent for not realizing on the collateral securing repayment of the Loan.
>
> 68. UFB's discouragement of bids at the Sheriff's sale and undisclosed refusal to entertain third party offers to purchase the Property following the Sheriff's sale constituted breaches of the Participation Agreement in multiple respects, i.e., the failure to administer the Loan consistent with a lender's usual and customary practices, failure to secure the participant lenders' prior consent to not fully realizing on the collateral securing repayment of the Loan, and failure to promptly notify the

---

[3] We refer to UFB and Village Capital, collectively as defendants/appellees, as "UFB."

participant lenders of events materially adversely affecting their interests.

69.    In addition, UFB had a duty to not omit to state any material fact when conveying information to the participant lenders regarding the Loan—including during the course of negotiations regarding the potential repurchase by UFB of the participation interest.

70.    UFB never informed the participant lenders that UFB had discouraged bids at the Sheriff's sale and subsequently refused to entertain third party offers to purchase the Property despite its contractual duty to do so and despite the participant lenders' unequivocal request for full disclosure of all "offers, calls and inquiries" as a prerequisite to execution of the Purchase Agreement.

71.    Instead, UFB knowingly and intentionally provided incomplete and misleading information that caused the participant lenders to believe that the pendency of the Anderson appeal had had a chilling effect on the market for the Property when, in fact, it was UFB's own conduct that eliminated any market.

72.    By virtue of its status as lead lender, UFB was in possession of information not readily available to the participant lenders regarding the level of third party interest in the Property prior to and at the Sheriff's sale, as well as the handling of "offers, calls and inquiries" directed solely to UFB following the Sheriff's sale.

73.    In undertaking to provide information regarding these matters to the participant lenders, UFB was obligated to provide complete information.

74. UFB, however, knowingly and intentionally misled the participant lenders to believe that there was no current market for the Property, when in fact UFB had actual knowledge to the contrary and had taken affirmative steps to eliminate any third party interest in the Property.

75. Neel's communications would lead any reasonable participant lender to believe that title problems allegedly created by the pendency of the Anderson appeal chilled or eliminated any potential market for the Property and that there were no third parties interested in purchasing the Property as a whole.

76. Although UFB's representations (incorporated by reference and reaffirmed in the Purchase Agreement) that it had not received any "offers" and had not engaged in any "negotiations" may have been literally accurate, such representations were intentionally incomplete, deceptive, and misleading.

77. In addition, UFB's representation that UFB had only received inquiries regarding the purchase of individual or small groups of undeveloped lots, rather than the Property as a whole, was false.

78. UFB purposefully created a false picture of the market for the Property and withheld information from the participant lenders in order to induce the participant lenders to execute the Purchase Agreement.

79. Had UFB informed the participant lenders that UFB had not received any "offers" and had not engaged in any "negotiations" based upon UFB's refusal to entertain offers or to engage in any negotiations, BloomBank (and likely the other participants) would not have agreed to execute the Purchase Agreement.

80.     BloomBank and the other participant lenders reasonably relied on the information being provided by UFB, particularly in light of UFB's contractual obligation to refrain from failing to realize on collateral without the participant lenders' prior consent.

81.     The participant lenders were fraudulently induced by UFB into execution of the Purchase Agreement, resulting in substantial damages to BloomBank, and the purported release of UFB and its affiliates, including Village Capital, set forth therein is void.

82.     UFB was in exclusive possession of information not possessed by and not readily available to the participant lenders that was material to the participant lenders' decision to execute the Purchase Agreement.

83.     UFB's failure to disclose that superior knowledge to the participant lenders rendered the transaction represented by the Purchase Agreement inherently unfair.

84.     Even in the absence of any fiduciary obligations, UFB had the obligation to not act in a manner inconsistent with the participant lenders' interests without their prior consent, and had the obligation not to withhold information from, or fail to disclose information to, the participant lenders necessary to make the information that was provided by UFB not misleading or inaccurate.

85.     By failing to make full disclosures to the participant lenders, UFB gained an advantage over the participant lenders at their expense.

86.     Although UFB had the right to retain and develop the Property for its own benefit after the purchase of the Tri-Capital Participant Group's interests, UFB did not have the right to surreptitiously and without disclosure, eliminate the market for the Property by its refusal to entertain offers in order to reduce the purchase price being paid by UFB to the Tri-Capital Participant Group for their interests.

87.     UFB's undisclosed discouragement of bids at the Sheriff's sale, refusal to entertain third party offers in excess of $2,800,000, and presentation of a misleading and incomplete portrait of the level of third party interest in the Property as a whole, amount to conduct so inherently unjust that BloomBank should be afforded a remedy under a theory of constructive fraud.

88.     Finally, after UFB repurchased the participation interest of the Tri-Capital Participant Group at an artificially and wrongfully suppressed repurchase price, UFB transferred title to the Property to its affiliate, defendant Village Capital.

89.     Village Capital continued the development and sale of the Property at a substantial profit at the instruction and on behalf of UFB.

90.     Village Capital's retention of the benefit of having received title to the Property at the expense of BloomBank would be manifestly unjust.

91.     BloomBank is therefore entitled to a recovery from Village Capital for unjust enrichment.

Appellant's App. Vol. III at 179-183.

On October 12, 2017, UFB moved to dismiss BloomBank's Third Amended Complaint on the ground that it failed to state a claim upon which relief could be granted, pursuant to Indiana Trial Rule 12(B)(6). Following briefing and oral argument by the parties, the trial court granted the motion to dismiss in an order dated February 12, 2017. BloomBank now appeals.

# Discussion and Decision

## Standard of Review

BloomBank challenges the trial court's order dismissing its complaint. A Rule 12(B)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of the plaintiff's claim, not the facts supporting that claim. *Bellwether Prop., LLC v. Duke Energy Ind., Inc.*, 87 N.E.3d 462, 466 (Ind. 2017). We review a Rule 12(B)(6) dismissal de novo, *id.*, and we accept as true the facts alleged in the complaint, viewing the pleadings in the light most favorable to the nonmoving party, with "every reasonable inference construed in the nonmovant's favor," *Birge v. Town of Linden*, 57 N.E.3d 839, 843 (Ind. Ct. App. 2016). If a complaint "recounts sufficient facts that, if proved, would entitle the plaintiff to obtain relief from the defendant," it states a claim upon which relief may be granted. *Bellwether*, 87 N.E.3d at 466; *see also Chenore v. Plantz*, 56 N.E.3d 123, 126 (Ind. Ct. App. 2016) (citation omitted) ("A complaint is sufficient and should not be dismissed so long as it states any set of allegations, no matter how unartfully pleaded, upon which the plaintiff could be granted relief."). And, a "complaint

does not fail to state a claim merely because a meritorious defense may be available." *Bellwether*, 87 N.E.3d at 466.

[22] A dismissal of a complaint under Rule 12(B)(6) "is seldom appropriate." *McGee v. Kennedy*, 62 N.E.3d 467, 471 (Ind. Ct. App. 2016). We review such motions "with disfavor because [they] undermine the policy of deciding causes of action on their merits." *Wertz v. Asset Acceptance, LLC*, 5 N.E.3d 1175, 1178 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*; *see also* Ind. Trial Rule 8(F) ("All pleadings shall be so construed as to do substantial justice, lead to disposition on the merits, and avoid litigation of procedural points.").

[23] We also review dismissal under Rule 12(B)(6) "under a stringent standard" because Indiana is a notice pleading state and, as such, requires only that a pleading[4] contain (1) a short and plain statement of the claim, and (2) a demand for relief. *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 135 (Ind. 2006) (citing T.R. 8(A)); *see also Mizen v. State ex rel. Zoeller*, 72 N.E.3d 458, 467 (Ind. Ct. App. 2017) (citation omitted) (noting Indiana's trial rules "are designed to avoid pleading traps and, to the greatest extent possible, ensure that cases are tried on the issues that their facts present"), *trans. denied*. Thus, under notice pleading, "the sufficiency of the complaint depends upon whether the opposing party has been adequately notified concerning the operative facts of a claim so

---

[4] "The 'pleadings' consist of a complaint and an answer, a reply to any counterclaim, an answer to a cross-claim, a third-party complaint, … an answer to a third-party complaint[,]" and "any written instruments attached to a complaint…." *Graves v. Kovacs*, 990 N.E.2d 972, 976 (Ind. Ct. App. 2013) (citing Indiana Trial Rule 9.2).

as to be able to prepare to meet it." *Graves v. Kovacs*, 990 N.E.2d 972, 976 (Ind. Ct. App. 2013). A complaint's allegations are sufficient if they would "put a reasonable person on notice as to why a plaintiff sues." *Shields v. Taylor*, 976 N.E.2d 1237, 1244-45 (Ind. Ct. App. 2012) (noting that notice pleading is designed to "sweep away needless controversies that have occurred either to delay trial on the merits or to prevent a party from having a trial because of mistakes in statement"); *see also KS&E Sports v. Runnels*, 72 N.E.3d 892, 901 (Ind. 2017) (quotation and citation omitted) (noting Indiana's "liberal standard" of notice pleading "merely requires that a complaint ... put the defendant on notice concerning why it is potentially liable and what it stands to lose").

[24] There is an exception to Indiana's liberal notice pleading requirements when a claim involves fraud. Indiana Trial Rule 9(B) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be specifically averred." This means that, generally, "to allege fraud sufficiently, the pleadings must state the time, the place, the substance of the false representations, the facts misrepresented, and identification of what was procured by fraud." *Kapoor v. Dybwad*, 49 N.E.3d 108, 120 (Ind. Ct. App. 2015), *trans. denied*. However,

> the exact level of particularity that is required will necessarily differ based on the facts of the case. [W]hile we require a plaintiff claiming fraud to fill in a fairly specific picture of the allegations in her complaint, we remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail.

*Id.* at 132 (internal quotations and citations omitted) (quoting *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013)). For example, where "the heart of a constructive fraud claim based on a fiduciary duty is non-disclosure, … [it] is not an event that can be pled with specificity[; i]t is therefore sufficient simply to plead that the disclosure did not occur." *Id.* at 135.

Here, BloomBank raised four claims in its Third Amended Complaint (hereinafter, "Complaint"): breach of contract, constructive fraud, actual fraud, and unjust enrichment. Its breach of contract claim is subject to notice pleading requirements. Its actual and constructive fraud claims must meet the more specific requirements for pleading fraud under Rule 9(B). And, because its unjust enrichment claim sounds in fraud, it too must meet the Rule 9(B) pleading requirements. *See Kapoor*, 49 N.E.3d at 132.

## Effect of the Release

BloomBank raises breach of contract claims based on UFB's actions and omissions that allegedly violated certain provisions of the Participation Agreement. However, the Purchase Agreement into which the parties subsequently entered contained a "Release by Seller" (the "Release") barring BloomBank from suing UFB for breach of the Participation Agreement. BloomBank maintains that the Release does not bar its breach of contract claims because BloomBank was fraudulently induced into executing the

Purchase Agreement containing the Release.[5] *Tru-Cal, Inc. v. Conrad Kacsik Instrument Sys., Inc.*, 905 N.E.2d 40, 44 (Ind. Ct. App. 2009) ("The general principle that fraud in the inducement vitiates a contract applies to releases."), *trans. denied*. Thus, if BloomBank stated a claim for fraud—actual, constructive, or both—in that UFB fraudulently induced BloomBank to enter into the Purchase Agreement, then the Release in that agreement is not binding and does not bar BloomBank's breach of contract claims. If, on the other hand, BloomBank failed to state a claim for fraud, its contract claims are barred by the Release. We, therefore, first address BloomBank's fraud claims.

## Constructive Fraud

[27] BloomBank asserted in its Complaint that UFB committed constructive fraud by fraudulently inducing the TriCapital participants (including BloomBank) to enter into the Purchase Agreement. Appellant's App. Vol. III at 182. "[C]onstructive fraud arises by operation of law from a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the existence or evidence of actual intent to defraud." *Rapkin Group, Inc. v. Cardinal Ventures, Inc.*, 29 N.E.3d 752, 759 (Ind. Ct. App. 2015), *trans. denied*. The elements of constructive fraud are: (i) a duty owed by the party to be charged to the complaining party due to their relationship; (ii)

---

[5] The trial court did not address the issue of the Release in its order of dismissal. However, BloomBank raised the issue in its Complaint, Appellant's App. Vol. III at 180-81, and the parties briefed the issue below, Appellant's App. Vol. IV at 23, 118.

violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Kapoor*, 49 N.E.3d at 124 (citing *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996)).

[28] For purposes of constructive fraud, the existence of a duty may arise in two ways: (1) the existence of a fiduciary relationship; and (2) the case of a buyer and seller. *Harmon v. Fisher*, 56 N.E.3d 95, 99-100 (Ind. Ct. App. 2016). BloomBank has alleged a duty arising in both ways. However, the sole basis of its claim of a duty created by a fiduciary relationship is based on the terms of the Participation Agreement; i.e., the "plain terms" of that contract "established that UFB was the lead lender" who had a duty to keep BloomBank informed. Appellant's Br. at 34-35, 39-41 (citing sections 4.1, 4.2, and 4.3 of the Participation Agreement). But it is well-established that contractual agreements do not give rise to a fiduciary relationship creating a duty and do not provide a basis for a constructive fraud claim. *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008) (citing *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1273 (Ind. Ct. App. 2000)). Therefore, BloomBank did not state a claim for constructive fraud based on UFB's alleged fiduciary duty.

[29] BloomBank did, however, state a claim that UFB owed it a duty as the buyer in a buyer/seller relationship. "Where there is a buyer and a seller, one party may

possess some knowledge not possessed by the other."[6] *Harmon*, 56 N.E.3d at 100. Thus, constructive fraud may arise in a buyer/seller relationship when: (1) a buyer makes unqualified statements[7] to induce another to sell; (2) the seller relies upon the statements; and (3) the buyer has professed to the seller that he has knowledge of the truth of those statements. *Am. Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247 (Ind. Ct. App. 2010). BloomBank alleged that (1) UFB made statements and omissions regarding third party interest in the Property (the truth of which were not within BloomBank's knowledge at the time) in order to induce BloomBank to sell its Participatory Interest, Appellant's App. Vol. III at 180-182; (2) BloomBank relied upon UFB's statements/omissions, *id*. at 181; and (3) UFB represented that it had knowledge of the truth of its statements, *id*.

[30]     BloomBank also sufficiently alleged the second element of constructive fraud, i.e., that UFB violated its duty to BloomBank by making deceptive material misrepresentations of past or existing facts and remaining silent when it had a duty to speak. Although on August 2, 2013, UFB did disclose to BloomBank a list of builders who had "contacted" UFB about the Property or "made inquiries" about the Property, Appellant's App. Vol. III at 245-46, BloomBank

---

[6] In the usual case, it is the seller who has superior knowledge not possessed by a buyer. However, the opposite may also be true, as it is alleged in this case.

[7] The "statement" may also be an omission to induce another to sell. *See, e.g.*, *Boots v. D. Young Chevrolet, LLC*, 93 N.E.3d 793, 799 (Ind. Ct. App. 2018) (quotation and citation omitted) ("Fraud is not limited only to affirmative representations; the failure to disclose all material facts can also constitute actionable fraud."), *trans. denied*.

alleged that UFB falsely represented at the time of the Purchase Agreement that those inquiries were only regarding the purchase of portions of the property rather than the property as a whole. *Id*. at 181. Yet, BloomBank alleged that it later learned on its own that Drees Homes had bid on the whole Property at the sheriff's sale, and Gradison had offered to purchase the Property after the sheriff's sale. *Id*. at 178-79. BloomBank further alleged that UFB failed to disclose that it had discouraged other bids at the sheriff's sale and that it had refused to entertain offers for purchase after the sheriff's sale, and that these omissions gave the TriCapital participants a false view of the marketability and/or value of the Property. *Id*. BloomBank alleged that these misrepresentations and/or failures to disclose—the truth of which were not within BloomBank's knowledge at the time—painted a false picture of the market for the Property, thereby inducing BloomBank to sell to UFB at a low price.

[31]  Moreover, BloomBank sufficiently alleged that UFB fraudulently induced it to enter into the purchase agreement by providing "incomplete and misleading information" about the Anderson appeal. Appellant's App. Vol. III at 180. UFB's statement that "[r]esolution of the Anderson litigation[,] based on what we anticipate the Anderson's strategy to be[,] could take several years," *Id*. at 245, could be considered an opinion and, of course, "an action in fraud requires a misrepresentation of material fact," not opinion. *BSA Const. LLC v. Johnson*, 54 N.E.3d 1026, 1031 (Ind. Ct. App. 2016) (quotation and citation omitted), *trans. denied*. However, that statement is not the sole basis of BloomBank's

claim. Rather, BloomBank specifically states in its complaint that it was UFB's failure to provide additional information of which it had knowledge that constituted the fraudulent inducement. Appellant's App. Vol. III at 180-81. As BloomBank's complaint asserts, UFB settled the Anderson appeal only a little over a month after the date of the Purchase Agreement. Yet, the information UFB provided—or failed to provide—to BloomBank led it to believe that the property could not be sold for quite a while due to the Anderson appeal. Whether or not UFB actually had information about the Anderson appeal— such as negotiations to settle that appeal—that it withheld from BloomBank is not the issue to be determined at this beginning stage of the litigation. Rather, at this point, it is sufficient that BloomBank's factual allegation that UFB withheld information about the Anderson appeal, if later proven true, would entitle BloomBank to relief on its constructive fraud claim. *Bellwether*, 87 N.E.3d at 466.

[32] BloomBank further alleged that it relied on UFB's fraudulent representations and omissions. UFB contends that BloomBank could not rely upon UFB's representations because BloomBank was a "sophisticated business entity" that gave a "warranty of due diligence" in section 3.3 of the Purchase Agreement.[8] Appellee's Br. at 29-30. However, UFB's contention begs the question of whether UFB fraudulently induced BloomBank to enter into that agreement in

---

[8] In section 3.3, BloomBank agreed that it "performed such due diligence that [it] deem[ed] necessary and appropriate in connection with the purchase and assignment contemplated hereunder." Appellant's App. Vol. III at 235.

the first place. That agreement did not extinguish UFB's alleged duty, in the buyer/seller context, to provide BloomBank with the material information that was solely within UFB's knowledge *before* the parties entered into the Purchase Agreement, nor did it extinguish BloomBank's alleged right to rely on UFB's material representations as to such knowledge. *Cranston*, 928 N.E.2d at 247.

[33] BloomBank also alleged that it suffered injury in the amount of the difference between the "full value"[9] of the Participatory Interest and the amount UFB paid for the Participatory Interest. *Id*. at 181-83. And, finally, BloomBank alleged that UFB gained an advantage at BloomBank's expense in that UFB obtained both the Property and the Participatory Interest for less than full value. *Id*. at 175, 182.

[34] BloomBank made the above allegations with enough specificity to meet the pleading requirements of Indiana Trial Rule 9(B). It gave specific examples of UFB's discouragement of competitive bidding at the sheriff's sale and its refusal to entertain offers to purchase after the sale. BloomBank: stated the time, place, and substance of two events[10] that were material and that UFB failed to disclose to BloomBank; stated which facts UFB failed to disclose regarding

---

[9] While the Complaint does not state what the "full value" of the Participatory Interest is, it does state that UFB purchased the Property for "a sum millions of dollars lower than the Property's actual value." Appellant's App. Vol. III at 175. Of course, the value of the Property affected the value of the Participatory Interest. And we reiterate that, at this point in the proceedings—i.e., a dismissal before the parties have even had an opportunity to conduct discovery—we do not test the sufficiency of the facts, only the legal sufficiency of the claims. *Bellwether*, 87 N.E.3d at 466.

[10] I.e., discouraging Drees Homes from bidding and refusing to entertain an offer to purchase from Gradison.

those two events, which led to misrepresentations of the marketability of the Property; and identified what UFB procured by fraud—i.e., the difference between the "full value" of the Property and the Participatory Interest and what UFB paid for them.[11] *Id*. at 175, 178-83. And, to the extent BloomBank alleged, but did not give specific examples of, UFB's non-disclosures, "[non-disclosure] is not [always] an event that can be pled with specificity," especially where, as here, the buyer is alleged to have superior if not exclusive knowledge of the facts relating to the expressions of interest in purchasing the Property. *Kapoor*, 49 N.E.3d at 135. Under such circumstances, it is "sufficient simply to plead that the disclosure did not occur." *Id*.

[35] Taking the facts alleged by BloomBank as true, as we must at this stage, BloomBank has stated a claim for constructive fraud, and the trial court erred in dismissing that claim. *Bellwether*, 87 N.E.3d at 466; *Birge*, 57 N.E.3d at 843.

# Actual Fraud

[36] BloomBank also alleged that UFB committed actual fraud to induce the TriCapital participants to enter into the Purchase Agreement. The elements of actual fraud are: (i) material misrepresentation of past or existing facts by the party to be charged (ii) which was false, (iii) which was made with knowledge

---

[11] Thus, this case is different from *Cranston*, cited by the Appellees, in that the plaintiff/buyers in *Cranston* failed to identify what facts were known only by the seller/defendant that would have affected the buyers' decision to buy, and failed to show that they relied on the seller's omissions. *Cranston*, 928 N.E.2d at 245. Moreover, *Cranston* was decided after a full bench trial, not in the context of a Rule 12(B)(6) dismissal where the alleged facts must be accepted as true and all reasonable inferences construed in the nonmovant's favor.

or reckless ignorance of the falseness, (iv) which was relied upon by the complaining party, and (v) which proximately caused the complaining party injury. *Kapoor*, 49 N.E.3d at 121 (citing *Rice*, 670 N.E.2d at 1289). Thus, the presence or absence of an intent to deceive is the essential element that distinguishes actual fraud from constructive fraud. *Id*.

[37] As we note above, BloomBank has sufficiently alleged that UFB made false material misrepresentations or omissions upon which BloomBank relied and which caused BloomBank injury. We further hold that BloomBank sufficiently alleged that UFB did so with knowledge or reckless ignorance of the falseness of its representations. BloomBank alleged that UFB's representative was at the sheriff's sale and "actively" and "purposely discouraged" Drees Homes and others from bidding against UFB on the Property as a whole. Appellant's App. Vol. III at 178. It further alleged that UFB knowingly failed to inform BloomBank of those actions. Thus, BloomBank alleged facts showing that UFB knew that it had discouraged other bidders but knowingly failed to disclose that information to BloomBank in order to induce BloomBank into accepting UFB's offer to purchase BloomBank's interest in the Property at a low price. Similarly, BloomBank alleged that UFB knew it was refusing to entertain offers to purchase the Property after the sale, and it gave the specific example of Gradison's expression of interest in purchasing the Property. BloomBank further alleged that UFB knowingly failed to disclose that information to the TriCaptial participants. Thus, BloomBank alleged UFB's intent to deceive with enough specificity to meet the pleading requirements of

Indiana Trial Rule 9(B), and the trial court erred in dismissing its actual fraud claim.

[38] Because BloomBank stated a claim that UFB fraudulently induced BloomBank to enter into the Purchase Agreement, it has also stated a claim that the Release contained in that contract is invalid. *Tru-Cal, Inc.*, 905 N.E.2d at 44. Thus, we proceed to BloomBank's breach of contract claims.

# Breach of Contract

[39] To prevail on a claim for breach of contract, a plaintiff must prove (1) the existence of a contract, (2) defendant's breach of that contract, and (3) damages from the breach. *E.g.*, *Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 78 (Ind. Ct. App. 2018), *trans. denied*. In its Complaint, BloomBank alleged, and it is not disputed, that the parties' Participation Agreement was a contract. BloomBank further alleged that UFB breached sections 4.1, 4.2, and 4.3 of that contract, causing it damages.[12] We address each allegation in turn.

---

[12] There is no dispute that the Complaint alleges damages from a breach of contact. Appellant's App. Vol. III at 183.

### *Sections 4.1 and 4.2*

<u>Usual and Customary Practices</u>

[40]    BloomBank alleged in its Complaint that UFB's discouragement of bids at the sheriff's sale of the Property and refusal to entertain third party offers to purchase the Property after the sheriff's sale violated section 4.2[13] of the contract by "fail[ing] to administer the Loan consistent with a lender's usual and customary practices." Appellant's App. Vol. III at 179. However, that first sentence of section 4.2, by its express terms, applies only to servicing and administration of "the Loan." The actions about which BloomBank complains occurred only after default on the Loan and in relation to realization on the collateral. Therefore, accepting BloomBank's allegations as true, they still do not support the claim for breach of the first sentence of section 4.2 of the contract.

---

[13] The trial court held that BloomBank failed to state a claim under sections 4.1, 4.2, and 4.3 of the Participation Agreement because those sections related only to the servicing and administration of the Loan, and BloomBank's complaint relates to UFB's conduct after default on the Loan and foreclosure. Appellant's App., Vol. IV, at 187. In support of this holding, the trial court relied upon the heading of Article IV, i.e., "Administration of the Loan." *Id*. However, the trial court failed to consider section 10.12 of the Participation Agreement, which expressly states that the headings of the articles in the agreement "are not intended to govern, limit, or aid in the construction of any term or provision hereof." Appellant's App. Vol. III at 193. It is a well-settled principle of contract interpretation that, if the language in the contract is unambiguous, courts must adhere to the plain meaning of that language. *E.g.*, *Performance Serv., Inc. v. Hanover Ins. Co.*, 85 N.E.3d 655, 660 (Ind. Ct. App. 2017). Therefore, the trial court erred when it limited the construction of sections 4.1, 4.2, and 4.3 to administration of the Loan based on the heading of Article IV.

Similarly, it is clear from the plain and unambiguous language of sections 1.1 and 3.4 of the parties' Purchase Agreement that the requirements of the Participation Agreement did not expire until the Closing Date (i.e., August 21, 2013) and delivery of the assignment of the Participation Interest. Appellant's App. Vol. III at 234-35. Therefore, the requirements of sections 4.1, 4.2, and 4.3 were in effect during the period of time at issue in the Complaint—i.e., after default on the Loan and before the execution of the Purchase Agreement.

[41] BloomBank also alleged that "UFB never disclosed to the participant lenders that UFB had discouraged bidding at the Sheriff's sale and also refused to entertain third party offers to purchase the Property, despite UFB's contractual obligation to secure the participant lenders' prior consent for not realizing on the collateral securing repayment of the Loan." *Id.* BloomBank alleged that those actions violated sections 4.1 and 4.2[14] of the contract by "fail[ing] to secure the participant lenders' prior consent to not fully realizing on the collateral securing repayment of the Loan." *Id.*

[42] It is clear from the face of the complaint that UFB did "realize on the collateral" when it sold the Property at a sheriff's sale and paid $2,800,000 for it, and that BloomBank and the other participants were aware that UFB intended to do so.[15] And BloomBank does not allege that it ever withheld its consent for such a sale. Rather, BloomBank contends that UFB violated the contract by withholding information that was necessary for the TriCapital participants to give "informed" consent to the realization. Appellant's Br. at 32.

---

[14] Unlike the first sentence of section 4.2, the relevant language of section 4.1 and subsection (b) of 4.2 does not expressly limit its application to the servicing and administering of the Loan. *Id.* at 187.

[15] *See* Pfeifer's letter dated July 31, 2013, discussing the upcoming sheriff's sale. Appellant's App. Vol. III at 247.

[43] The Complaint did not state that the Participation Agreement required "informed" consent, and the contract does not define the term "consent" as meaning "informed consent." However, a contract need not define every term in order to state a claim for breach of contract, especially under the rules of notice pleading. Moreover, "it is a principle of contract interpretation that specific words and phrases cannot be read exclusive of other contractual provisions; rather, the parties' intentions must be determined by reading the contract in its entirety and attempting to construe contractual provisions so as to harmonize the agreement." *Ambrose v. Dalton Const., Inc.*, 44 N.E.3d 707, 715 (Ind. Ct. App. 2015) (internal quotations and citation omitted), *trans. denied*. BloomBank's Complaint cited provision 4.3 of the Participation Agreement which required UFB to promptly notify the TriCapital participants of any events of which UFB had actual knowledge and which might materially adversely affect the TriCapital participants' interests. Reading section 4.2 in conjunction with section 4.3, BloomBank stated a claim that the parties intended that UFB provide BloomBank and the other participants with all known information necessary to give informed consent to realization on the collateral. And BloomBank's Complaint states that UFB failed to provide such information and gives specific examples of such failure.

[44] Again, Indiana's notice pleading rules merely require pleading the operative facts so as to place the defendant on notice as to the evidence to be presented at trial. *Shields*, 976 N.E.2d at 1245. Although BloomBank did not specifically state in its Complaint that the parties meant "consent" to mean "informed

consent," BloomBank's allegations that UFB had a contractual obligation to keep BloomBank informed and failed to do so were sufficient to put UFB on notice of BloomBank's contention—i.e., that UFB violated the contract by failing to provide BloomBank with enough information to validly "consent" to UFB's realization on the collateral. Given Indiana's liberal standard of notice pleading, *KS&E Sports*, 72 N.E.3d at 901, we hold that the trial court erred in dismissing that claim.

### *Section 4.3*

BloomBank alleged in its Complaint that, under section 4.3 of the contract, "UFB was obligated to promptly notify the participant lenders of any event that might materially adversely affect the participant lenders' interests," and it attached a copy of the contract containing that language. Appellant's App. Vol. III at 173. BloomBank further alleged that UFB violated this section by failing to disclose to the participant lenders that UFB had discouraged bidding at the sheriff's sale and that it had refused to entertain third party offers to purchase the Property. *Id.* at 179. And BloomBank gave specific examples of the failures to disclose the events that might have materially and adversely affected its interests. *Id.* at 178-79 (citing UFB's discouragement of Drees Homes bidding at the sheriff's sale and its refusal to entertain any offer from Gradison). Under the standards for notice pleading, BloomBank's assertions were sufficient to put

UFB on notice of the claims against it. The trial court erred in holding that UFB failed to state a claim of breach of section 4.3 of the contract.[16]

## Unjust Enrichment

[46] Finally, BloomBank alleged a claim of unjust enrichment against Village Capital, an affiliate of UFB.

> A claim for unjust enrichment "is a legal fiction invented by the common law courts in order to permit a recovery ... where the circumstances are such that under the law of natural and immutable justice there should be a recovery ..." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991) (citation omitted). "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." RESTATEMENT OF RESTITUTION § 1 (1937). To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. *Bayh*, 573 N.E.2d at 408.

*Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009).

[47] Here, BloomBank alleged that the benefit conferred was Village Capital's profits from the sale of the Property that UFB fraudulently obtained and then transferred to Village Capital, an "affiliate"[17] of UFB. Appellant's App. Vol. III

---

[16] We note that the only basis for the trial court's erroneous holding was its incorrect finding that section 4.3 related only to the administration and servicing of the Loan, as noted in footnote 15, above.

[17] An affiliate is defined as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, BLACK'S LAW DICTIONARY (10th ed. 2014).

at 182-83. BloomBank further alleged that the benefit was conferred on Village Capital at BloomBank's expense; that is, if UFB had not fraudulently obtained BloomBank's Participatory Interest, BloomBank would still own that interest and be entitled to its share of the profits from the sale of the Property. *Id*. at 182-83. And BloomBank alleged that Village Capital's retention of the benefit without payment would be unjust because that benefit was obtained through its affiliate's (UFB's) fraudulent conduct. *Id*. at 182. BloomBank's Complaint supports these allegations with detailed factual assertions regarding UFB's fraudulent inducement to the TriCapital participants to enter into the Purchase Agreement at less than full value, *id*. at 178-83, and factual assertions that on December 3, 2013, Village Capital obtained the Property through a transfer from UFB and thereafter obtained substantial profit from the subsequent sale of that property, *id*. at 178, 182-83. BloomBank further alleged the specific amount of gross proceeds from the sales of the Property as of the date of the Complaint. *Id*. at 178. Thus, BloomBank has alleged a claim of unjust enrichment.

[48] UFB contends that BloomBank failed to state a claim for unjust enrichment because BloomBank was not the entity that conferred the benefit on Village Capital and Village Capital did not request the benefit from BloomBank. It is true that, "[t]o recover under an unjust enrichment claim, a plaintiff must generally show that he rendered a benefit to the defendant at the defendant's express or implied request...." *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012). However, this Court has allowed a plaintiff to recover against a defendant for

unjust enrichment even when it was a third party that conferred the benefit on the defendant and the defendant did not request the benefit from the plaintiff. *See Landers v. Wabash Center, Inc.*, 983 N.E.2d 1169, 1173-74 (Ind. Ct. App. 2013) (allowing employer to recover under theory of unjust enrichment against wife of ex-employee who had stolen from employer and given stolen funds to wife); *Dominiack Mech., Inc. v. Dunbar*, 757 N.E.2d 186, 190-91 (Ind. Ct. App. 2001) (allowing plaintiff corporation to proceed in unjust enrichment claim against party-goers who attended a party paid for with funds an ex-employee embezzled from the corporation); *Paul v. I.S.I. Serv., Inc.*, 726 N.E.2d 318, 322 (Ind. Ct. App. 2000) (company was entitled to preliminary injunction against wife of embezzling company co-owner under theory of unjust enrichment); *see also Marquette Bank v. Brown*, No. 4:14-cv-00034, 2015 WL 1505685, at *13 (S.D. Ind. March 31, 2015) (holding that, under Indiana law, "recovery is possible against a defendant who was unjustly enriched by a misappropriation, even if the plaintiff did not intend to confer a benefit upon that defendant and that defendant was not personally responsible for the misappropriation") (citing *Paul*, 726 N.E.2d at 322, and *Dominiack Mech.*, 757 N.E.2d at 191).

[49] The above holdings are consistent with the Restatement of Restitution and Unjust Enrichment. "If a third person makes a payment to the defendant to which (as between claimant and defendant) the claimant has a better legal or

equitable right,[18] the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT: PAYMENT TO DEFENDANT TO WHICH CLAIMANT HAS A BETTER RIGHT § 48 (AM. LAW INST. 2018). Similarly, "if a third person makes a payment to the defendant *in respect of an asset belonging to the claimant*,[19] the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT: PAYMENT TO DEFENDANT IN REPECT OF CLAIMANT'S PROPERTY § 47 (AM. LAW INST. 2018) (emphasis added). Here, BloomBank alleged that third person purchasers made payments to Village Capital in respect of the Property which equitably belonged to BloomBank due to UFB's alleged fraudulent actions resulting in UFB's purchase of that Property for less than its full value. Appellant's App. Vol. III at 182-83. And BloomBank alleged that it was therefore entitled to restitution from Village Capital as necessary to prevent unjust enrichment. *Id*. at 183. Thus, BloomBank stated a claim for unjust enrichment, and the trial court erred in dismissing that claim.

---

[18]  "[T]he words 'better legal or equitable right' refer to a paramount interest of a kind recognized in law or equity." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT: PAYMENT TO DEFENDANT TO WHICH CLAIMANT HAS A BETTER RIGHT § 48 cmt. a (AM. LAW INST. 2018).

[19]  "Ownership for this purpose may be legal or equitable…" RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT: PAYMENT TO DEFENDANT IN RESPECT OF CLAIMANT'S PROPERTY  § 47 cmt. a (AM. LAW INST. 2018).

# Conclusion

[50] BloomBank failed to state a claim for constructive fraud based on UFB's alleged fiduciary duty stemming from a contract, i.e., the Purchase Agreement. *Allison*, 883 N.E.2d at 123. However, BloomBank did state a claim for constructive fraud based on UFB's duty as a buyer possessing knowledge not possessed by the seller, BloomBank. *Harmon*, 56 N.E.3d at 100. BloomBank also stated a claim for actual fraud, as it alleged facts that, if true, show that UFB knew it made false material misrepresentations or omissions in order to induce BloomBank to enter into the Purchase Agreement for the Property. *Kapoor*, 49 N.E.3d at 121. Furthermore, BloomBank stated its constructive and actual fraud claims with enough specificity to satisfy the requirements of Trial Rule 9(B).

[51] Because BloomBank stated a claim that the Purchase Agreement was fraudulently induced, the Release in that document does not bar BloomBank's breach of contract claims. *Tru-Cal*, 905 N.E.2d at 44. And BloomBank stated a claim that UFB breached sections 4.1 and 4.2 of the Participation Agreement by failing to provide BloomBank with enough information to validly consent to UFB's actions regarding the realization on the collateral, i.e., the Property. BloomBank also stated a claim that UFB breached section 4.3 of the Participation Agreement by failing to disclose to the participant lenders that UFB had discouraged bidding at the sheriff's sale and that it had refused to entertain third party offers to purchase the Property. However, BloomBank failed to state a claim that UFB's actions violated the "usual and customary

practices" language of section 4.2, as that language expressly applied only to the servicing and administration of the loan.

[52] Finally, BloomBank alleged, with enough specificity to state a claim for unjust enrichment against Village Capital, that Village Capital was unjustly enriched by UFB's fraudulent actions in the purchase of the Property subsequently transferred to, and sold by, Village Capital. *Zoeller*, 904 N.E.2d at 220; RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT: PAYMENT TO DEFENDANT IN REPECT OF CLAIMANT'S PROPERTY § 47 (AM. LAW INST. 2018).

[53] Affirmed in part, reversed in part, and remanded.

Mathias, J., and Bradford, J., concur.